**24SL-CC02642**

## IN THE CIRCUIT COURT OF ST. LOUIS COUNTY,
## STATE OF MISSOURI

MONTILEONE PROPERTIES, LLC,    )

        Plaintiff,    )

v.    )

AAMCO TRANSMISSIONS, LLC,    )

**Serve: Jordan Zucker, Esq.**    )
      **410 Horsham Road, Suite 105**    )
      **Horsham, PA 19044**    )

Cause No.:

Division No.:

```
+-----------------+
|    EXHIBIT      |
|                 |
|       A         |
+-----------------+
```

### PETITION FOR BREACH OF LEASE AND OTHER RELIEF

COMES NOW Plaintiff, Montileone Properties, LLC, by and through its undersigned counsel, and as and for its Petition for Breach of Lease and Other Relief against Defendant, Aamco Transmissions, LLC, states to the Court as follows:

### Parties, Jurisdiction and Venue

1.    Plaintiff, Montileone Properties, LLC ("***Plaintiff***") is and at all times relevant hereto was, a Missouri limited liability company in good standing; owning commercial real property in St. Louis County, Missouri; and having the capacity to bring this lawsuit.

2.    Defendant, Aamco Transmissions, LLC ("***Defendant***") is and at all times relevant hereto was, a foreign limited liability company not registered and/or not in good standing in the State of Missouri, but which entered into a lease agreement in St. Louis County, and which has the capacity to be sued.

3.    This Court has jurisdiction over this matter pursuant to Section 478.070 RSMo., and venue is proper herein pursuant to Section 508.010 RSMo.

## Allegations Common to All Counts

### A. The Parties' Relationship and Business History

4.      Beginning in and around 2011, Plaintiff's principal and sole member, Tim Montileone ("*Mr. Montileone*") was an Aamco franchise owner.

5.      In that role, Mr. Montileone owned and operated several Aamco Transmission centers in St. Louis County, Missouri, including one located in Plaintiff's commercial real property at 8503 Manchester Road, Brentwood, MO 63144 (the "*Property*").

6.      In 2018, a dispute arose between Aamco and Mr. Montileone that resulted in the parties terminating their franchisor/franchisee relationship (the "*Franchise Termination*").

7.      As part of the Franchise Termination, Aamco acquired the business assets and equipment utilized at the various locations, including the one located in the Property.

8.      In addition to acquiring the assets and equipment, Aamco also agreed to enter into, and did in fact enter into, a lease agreement with Plaintiff for Aamco's continued use of the Property (the "*Brentwood Aamco Lease*").  A true and accurate copy of the Brentwood Aamco Lease is attached hereto as *Exhibit A* and is incorporated herein by reference as if fully set forth.

9.      The Brentwood Aamco Lease, dated October 29, 2018, provides for, among other things, a ten-year term with a base rent of Sixty-Thousand Dollars per year with an escalator of 1.75% per year.

10.      In addition, the Defendant was required to pay for repairs, maintenance, insurance, real estate taxes, and utilities.

11.      The Brentwood Aamco Lease and the promised performance thereunder, was specifically called-for in the asset purchase agreement by which the Franchise Termination was effectuated and was critical to the transaction because the stream of revenue it provided, and was

to continue providing, constituted the majority of the monetary consideration Plaintiff was to receive from Aamco in exchange for giving up the three (3) franchises.

**B. Defendant Improperly Vacates the Property and ceases performing under the Brentwood Aamco Lease.**

12.    On or about February 1, 2024, Plaintiff was advised that the Defendant had ceased operations at the Property and had vacated the space.

13.    Plaintiff then contacted, Mr. Jordan Zucker, Aamco's Vice President and director of its legal department, regarding the Property and Aamco's performance under the terms of the Brentwood Aamco Lease.

14.    Mr. Zucker responded by informing Mr. Montileone that he would "*look further into this situation*" and that as far rental payments were concerned, he believed there was a "*10-day grace period before any alleged rent is due before fees or interest may be assessed…[and]…I anticipate we'll be in further contact during this period*." A true and accurate copy of the exchange is attached hereto as ***Exhibit B*** and is incorporated herein by reference as if fully set forth.

15.    There was, however, no meaningful follow up thereafter, and Defendant has not paid any rent to Plaintiff since December 29, 2023.

16.    On March 2, 2024, Plaintiff's Counsel sent a demand letter to Defendant regarding the Brentwood Aamco Lease and Defendant's obligations thereunder. A true and accurate copy of the Demand Letter is attached hereto as ***Exhibit C*** and is incorporated herein by reference as if fully set forth.

17.    The demand letter sought, among other things, access to the Property as set out in Section 15.1 of the Brentwood Aamco Lease, which obligates Defendant to provide Plaintiff and its agents with full access to the Property within seventy-two (72) hours of receiving written request.

18.     Despite that requirement, and Defendant's receipt of written demand, the Defendant failed and refused to facilitate the access.

19.     Even after two follow-up contacts from Plaintiff's Counsel, Defendant still failed to facilitate access to the Property until March 26, 2024, at which time Plaintiff conducted a walkthrough of the Property and documented its condition.

20.     Upon review of the Property, it was apparent that the Defendant had made multiple changes to the layout, including the removal of carpet, walls and an interior window, conversion of an office into part of the garage, and the creation of a transmission build room.

21.     Plaintiff subsequently secured bids to return the Property to its pre-lease condition.

### Count I – Breach of Lease

22.     Plaintiff restates and realleges the allegations set out in all preceding paragraphs, and further states and alleges as follows:

23.     On October 29, 2018, and as part of a larger Franchise Termination, the parties entered into the Brentwood Aamco Lease attached hereto as Exhibit A.

24.     On or before February 1, 2024, Defendant breached the Brentwood Aamco Lease by vacating the Property and failing and refusing to perform the obligations set out therein, including a) the payment of rent, real estate taxes, and utilities; b) the making of repairs and continued maintenance; and c) effectuation of appropriate insurance coverage, among other things.

25.     Plaintiff has secured a bid to return the Property to its pre-lease condition, the total of which comes to $58,367.00.  A true and accurate copy of the bid is attached hereto as ***Exhibit D*** and is incorporated herein by reference as if fully set forth.

26.     The Defendant's breach of the Brentwood Aamco Lease has also required Plaintiff to secure insurance for the Property for casualty and flooding, which was Defendant's obligation,

and for which Plaintiff is now incurring an additional $1,279.01 per month.  A true and accurate copy of Plaintiff's insurance quote is attached hereto as *Exhibit E* and is incorporated herein by reference as if fully set forth.

27.     Plaintiff has also been directly and proximately damaged in the form of lost rent, which will continue to accrue through the term of the Brentwood Aamco Lease, the total of which is $375,997.26, exclusive of late fees and other costs and expenses called for under the Brentwood Aamco Lease.

28.     As a result of Defendant's breach, Plaintiff is now being forced to incur costs and expenses for utilities, routine maintenance and insurance, the total of which amounts to approximately $90,000.00 over the remaining term of the Brentwood Aamco Lease, exclusive of any unforeseen costs and expenses attendant to any unforeseen emergency repairs or maintenance.

WHEREFORE, Plaintiff prays this Court for judgment in its favor and against Defendant in the amount of $523,367.00, for pre-judgment interest at the statutory rate, for all of Plaintiff's fees and expenses incurred herein, including reasonable attorney's fees, and for such other and further relief as the Court deems just and proper.

## <u>Count II – Breach of Good Faith and Fair Dealing</u>

29.     Plaintiff restates and realleges the allegations set out in all preceding paragraphs, and further states and alleges as follows:

30.     Missouri law implies a covenant of good faith and fair dealing in every contract.

31.     The implied duty requires a party to cooperate with the other party to enable performance and achieve the expected benefit of the contract.

32.     Defendant has breach of the implied duty of good faith and fair dealing by vacating the Property and evading the spirit of the Brentwood Aamco Lease, which was a material

inducement to Plaintiff to enter into the Franchise Termination and accompanying asset purchase agreement in 2018.

33.     By vacating the Property and failing to perform under the Brentwood Aamco Lease, Defendant has not only denied Plaintiff of the expected benefit of the Brentwood Aamco Lease, but also the expected benefit of the asset purchase agreement and Franchise Termination.

34.     Defendant's actions were purposeful and done to, among other things, exploit changing economic conditions to the detriment of Plaintiff.

35.     As of the date of this Petition, Defendant's actions have directly and proximately damaged Plaintiff in excess of Five-Hundred Thousand Dollars.

36.     WHEREFORE, Plaintiff prays this Court for judgment in its favor and against Defendant in the amount of $523,367.00, for pre-judgment interest at the statutory rate, for all of Plaintiff's fees and expenses incurred herein, including reasonable attorney's fees, and for such other and further relief as the Court deems just and proper.

Respectfully submitted,
HEIN SCHNEIDER & BOND P.C.


/s/ John Hein
John Hein #53182
2244 S. Brentwood Boulevard
St. Louis, Missouri 63144
(314) 863-9100
(314) 863-9101 (Fax)
jjh@hsbattorneys.com
**Attorneys for Plaintiff**

# LEASE AGREEMENT

THIS LEASE AGREEMENT (the *"Lease"*), made and entered into as of October 29, 2018 (the *"Effective Date"*), by and between Montileone Properties, LLC (*"Landlord"*), and AAMCO Transmissions LLC (*"Tenant"*).

## ARTICLE I
## DEFINITIONS

1.1    **Basic Lease Information and Certain Definitions.** For purposes of this Lease, the following terms shall have the meanings set forth below:

"*Adjustment Date*" means the annual anniversary of the Commencement Date and each Annual anniversary of such date thereafter; provided, however, if the Commencement Date is other than the first (1st) day of a month, then the first "Adjustment Date" shall mean, as the case may require, the first (1st) day of the first (1st) month occurring after the first anniversary of the Commencement Date.

"*Applicable State Law*" means the law of the state of in which the Property is located.

"*Base Rent*" means, for the initial Lease Year, the aggregate amount of Sixty Thousand and No/100 Dollars ($60,000.00), payable in monthly installments of one-twelfth of that amount. Effective on each Adjustment Date, the Base Rent shall increase by one and seventy five hundredths percent (1.75%) (the *"Base Rent Increase"*). If Tenant exercises the Extension Option (as defined herein), on the first (1st) day of each Extension Term, the Base Rent shall increase by the Base Rent Increase.

"*Building*" means that certain and related improvements located upon the Site.

"*Commencement Date*" means the Effective Date.

"*Default Rate*" means five percent (5%) per annum.

"*Hazardous Substances*" means (i) any flammable, explosive, toxic, radioactive, corrosive or otherwise hazardous chemical, substance, liquid, gas, material or waste or component thereof, (ii) petroleum-based products, diesel fuel, paints, solvents, lead, radioactive materials, cyanide, acids, DDT, pesticides, ammonia compounds, and any other items which are regulated under Environmental Law, and (iii) any item defined as or otherwise characterized as a "hazardous substance", "hazardous material", "hazardous waste", "regulated substance" or "toxic substance" under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §9601, et seq., Hazardous Materials Transportation Act, 49 U.S.C. §1801, et seq., Resource Conservation and Recovery Act of 1976, 42 U.S.C. §6901 et seq., Clean Water Act, 33 U.S.C. §1251, et seq., Safe Drinking Water Act, 14 U.S.C. §300f, et seq., Toxic Substances Control Act, 15 U.S.C. §2601, et seq., Atomic Energy Act of 1954, 42 U.S.C. §2014 et seq., and any similar federal, state or local laws, and all regulations, guidelines, directives and other requirements thereunder, all as may be amended or supplemented from time to time.

EXHIBIT

A

"*Landlord*" as used in this Lease means only the owner, or the mortgagee in possession, for the time being of the Property (or the owner of a lease of the Building or of the Property), so that in the event of any transfer of title to the Property, or in the event of a lease of the Building or of the Property, upon notification to Tenant of such transfer or lease the said transferor landlord shall automatically be relieved of all obligations and liabilities accruing hereunder and which relate solely to the period from and after the effective date of said transfer, provided that any funds of Tenant then being held by Landlord are delivered to Landlord's successor. The obligations to be performed by Landlord hereunder shall be binding on Landlord's successors and assigns only during their respective periods of ownership and it shall be deemed and construed as a covenant running with the land without further agreement between the parties or their successors in interest, or between the parties and the transferee of title to the Property or said lease, or the said lessee of the Building, or of the Property, that the transferee or the lessee has assumed and agreed to carry out any and all of such covenants, obligations and liabilities of Landlord hereunder.

"*Landlord Parties*" means Landlord, and its members, directors, officers, employees and agents.

"*Laws*" means laws and ordinances of any and all federal, state, city, town, county, borough and village governments and rules, regulations, orders and directives of any and all departments, subdivisions, bureaus, agencies or offices thereof, and of any other governmental, public or quasi- public authorities having jurisdiction over the Buildings and/or the Site, including, without limitation, the Americans with Disabilities Act of 1990, as amended, and the direction of any public officer pursuant to law, whether now or hereafter in force.

"*Lease*" has the meaning given that term in the preamble.

"*Lease Year*" means (i) with respect to the first Lease Year, the period commencing with the Commencement Date, and ending on the date that is the last day of the month in which the day immediately preceding the first (1st) anniversary of the Commencement Date occurs, and (ii) for each successive Lease Year, the twelve (12) full, calendar month period following the first Lease Year, during the Term (as hereinafter defined), provided that the last Lease Year of the Term may be a shorter period if this Lease is terminated early.

"*Property*" means the Site (as hereinafter defined), together with the Building and improvements located thereon.  The Property may also be referred to as the "*Premises.*"

"*Rent*" means, collectively, Base Rent and Additional Rent.

"*Site*" means, with respect to the Property, the real property located at 8503 Manchester Road, Brentwood, St. Louis, MO 63144 as more particularly described in <u>Exhibit A</u> attached hereto.

"*Tenant*" means the Tenant herein named or any assignee or other successor in interest (immediate or remote) of the Tenant herein named, which at the time in question is the owner of the Tenant estate and interest granted by this Lease.

## ARTICLE II
## TERM

2.1    **Term.** This Lease shall continue in force for a term (the *"Term"*) commencing on the Commencement Date, and ending on the last day of the month in which the day immediately preceding the Ten (10) year anniversary of the Commencement Date occurs, or extended as herein provided or by law. See Section

2.2    **Termination Right**. Provided Tenant is not in default under this Lease beyond the applicable cure period at the time of providing a notice of termination, Tenant is hereby granted the one time right to terminate this Lease within the one hundred eighty (180) day period that begins on the date one hundred and twenty (120) days before the seventh anniversary of the Commencement Date and ends sixty (60) days thereafter, effective upon not less than one hundred twenty (120) days' notice. If Tenant elects to exercise this termination right, Tenant shall pay a termination fee equal to twelve (12) monthly installments of the then-current Base Rent, which shall be due on the effective date listed in the termination notice.

2.3    **Extension of the Term.** Tenant shall have the right and option ("*Extension Option*") to renew and extend the initial Term of this Lease for up to two (2) consecutive renewal periods of five (5) years each (each, an "*Extension Term*"), with each being on the same terms and conditions set forth herein, except that the Base Rent shall be as provided in Section 3.1. Tenant shall exercise the Extension Option by delivering written notice to Landlord of its election to extend the Term pursuant to the Extension Option at least ninety (90) days prior to the end of the Term or the then current Extension Term. Notwithstanding the foregoing, if Tenant shall have failed to provide written notice of exercise of a renewal option under this Section 2.2, then before this Lease shall be deemed to have expired, Landlord shall provide written notice to Tenant of Tenant's failure to renew and Tenant shall have a period of ten (10) days following receipt of such notice to exercise its right to renew this Lease.

## ARTICLE III
## RENT

3.1    **Base Rent.** The Base Rent shall be payable in advance in monthly installments during any Lease Year, and shall be due on or before the first (1st) day of each calendar month during the Term (each a "*Payment Date*"), beginning on the Commencement Date; provided, however, that if the Commencement Date is a day other than the first day of a calendar month, then a prorated partial month's Base Rent for the period commencing with the Commencement Date through the last day of such calendar month shall be due and payable on the Commencement Date, which shall be prorated based on the number of days contained in such calendar month. Base Rent shall be payable at Landlord's address set forth in Section 22.1.

3.2    **Late Charge.** In the event that Tenant shall fail to pay any installment of Base Rent or any payment of Additional Rent within ten (10) days after the date on which such payment is due, Tenant shall pay to Landlord a late charge equal to Two Hundred Dollars ($200) in order to compensate Landlord for the extra administrative expenses incurred. Base Rent or Additional Rent that is more than ten (10) days past due shall bear interest at the Default Rate, from that date until paid.

3

    3.3    **Additional Rent.** All sums, liabilities, obligations, and other amounts which Tenant is required to pay or discharge pursuant to this Lease in addition to the Base Rent, together with any interest, penalty, or other sum which may be added for late payment thereof, shall constitute additional rent hereunder (*"**Additional Rent**"*). In the event of any failure on the part of Tenant to pay or discharge any of the foregoing, Landlord shall have all rights, powers, and remedies provided for herein or by law or equity or otherwise in the case of nonpayment of Rent.

## ARTICLE IV
## CONDITION OF PROPERTY

    4.1    **CONDITION OF PROPERTY.** On the Commencement Date, Landlord shall deliver possession of the Premises to Tenant: broom-clean and free of debris, vacant and free and clear of possession and all rights of any third parties; with any work required of Landlord "substantially completed;" with all utilities connected and in good, working order; with all plumbing, electrical, fiber optic systems, mechanical systems (including HVAC), lighting, levelers, bumpers and seals, and the fire system in good, working order; with the entire roof of the Premises in sound and water-tight condition (including there being no leaks in the roof); with full compliance with the Americans with Disabilities Act and the regulations thereunder; with the parking lot in good condition; and, if requested by Tenant, in-ground lifts, if any, shall be removed and cemented over by Landlord in accordance with applicable law; and free of all Hazardous Substances (as hereinafter defined).

## ARTICLE V
## USE; MAINTENANCE

    5.1    **Permitted Use.** Tenant shall use the Property as (i) a warehouse, storage, and distribution center; (ii) a store for the sale of automobile, truck or other motor vehicle accessories, parts and related products; (iii) an automobile, truck or other motor vehicle service center, including, without limitation, garage and service bays for the performance of mechanical work for motor vehicles and the sale and installation of automotive tires; and (iv) for any other lawful purpose which is not inconsistent with the foregoing uses.

    5.2    **Governmental Regulations.** Tenant shall comply with all laws, ordinances, orders, rules and regulations (state, federal, municipal, and other agencies or bodies having any jurisdiction thereof) with reference to the use, condition and occupancy of the Property, including, but not limited to all environmental laws and regulations. Should Tenant inadvertently violate any of the same, Tenant shall, as soon as reasonably possible after discovery of any such violation, take all measures reasonably necessary to comply with the law.

    5.3    **Tenant's Maintenance and Repair Obligations.** Tenant agrees that it shall, throughout the Term of this Lease, keep and maintain the interior non-structural portions of the Premises in good order and repair, including maintenance and repair of the heating and air conditioning (HVAC), plumbing and/or electrical systems (excluding light fixtures and bulbs) at the Property, the maintenance and repair of the parking areas, driveways, and sidewalks, the maintenance, repair, and replacement of the windows and doors, and the landscaping and trash removal required at the Property.

5.4    **Landlord's Maintenance and Repair Obligations.** The Landlord agrees that it will, at its sole cost and expense during the Term, make all other alterations, improvements, repairs and replacements required in connection with the Property, including, without limitation, the following: maintenance, repair and/or replacement of the roof (including downspouts and gutters), roof membrane, exterior walls, interior and exterior load-bearing walls, foundation, and floors (excluding floor finishing such as tile, carpeting and the like); replacement of all parking areas, driveways, and sidewalks; replacement of, or improvements to, components of heating and air conditioning (HVAC), plumbing and/or electrical systems (excluding light fixtures and bulbs) of the Premises; maintenance, repair, and replacement of all shared and/or exterior water lines, sewer lines, gas lines, or electrical transmission lines and related facilities serving the Premises; all other repairs that Tenant is not responsible for under the terms of this Lease; and all capital expenditures related to additions, improvements, replacements, re-arrangements and re-installations of the Premises and/or the Property. The Landlord's obligation to replace the HVAC systems is contingent upon the Tenant properly maintaining and repairing the HVAC systems during the Term.

5.5    **Tenant's Maintenance and Repair Obligations During the Extension Term**. During the Extension Term, the Tenant shall be responsible for all maintenance and repair obligations required at the Premises, including, but not limited to the roof, roof membrane, exterior walls, interior and exterior load-bearing walls, foundation, the repair and replacement of all parking areas, driveways, and sidewalks; the replacement of, or improvements to, the components of heating and air conditioning (HVAC), plumbing and/or electrical systems. If the Tenant determines not to exercise the Extension Option, upon the conclusion of the Lease, the Tenant shall have no further maintenance and repair obligations with respect to the Premises except as otherwise expressly set forth herein.

5.6    **Net Lease**. It is the intention of Landlord and Tenant that except for the Landlord's obligations set forth in this Lease, the Rent shall be net to Landlord.

<div align="center">

**ARTICLE VI**
**RIGHTS OF EARLY TERMINATION**

</div>

6.1    **Rights of Early Termination**. In the event that after commencement of the Lease any appropriate Governmental Authority (as hereinafter defined) determines that a use and occupancy permit, or other similar operational permit, shall be required in order for Tenant to use, occupy and operate the Premises consistent with the Permitted Uses (as hereinafter defined) (the **"Occupancy Permit"),** then Tenant shall pursue the issuance of an Occupancy Permit, at Landlord's sole cost and expense, and Landlord shall cooperate with Tenant in seeking the Occupancy Permit. If (a) the Governmental Authority does not issue an Occupancy Permit to Tenant on terms and conditions that are acceptable to Tenant, and/or (b) the Governmental Authority otherwise determines that Tenant may not continue to use, occupy and operate the Premises consistent with the Permitted Uses, then Tenant shall have the right to terminate this Lease by written notice to the Landlord. Any and all costs incurred by Tenant in seeking to obtain the Occupancy Permit shall be promptly reimbursed to Tenant by Landlord. In addition, if any appropriate Governmental Authority determines that Tenant may not lawfully use, occupy and operate the Premises consistent with the Permitted Uses until the Occupancy Permit is issued, then Tenant shall have the right to immediately terminate this Lease by written notice to

<div align="center">5</div>

the Landlord and any Base Rent due shall abate from the period when the notice of non-lawful occupancy was delivered to Tenant.

## ARTICLE VII
## TAXES AND UTILITIES

7.1     **Taxes.** Tenant shall pay, or at Landlord's option, reimburse Landlord for the payment by Landlord of, all taxes, assessments, and other governmental charges, whether federal, state, county or municipal, and whether they be by taxing districts or authorities presently taxing the Property or by others, subsequently created or otherwise, and any other taxes and assessments levied or assessed against the Property (together, *"Taxes"*). If Tenant pays the Taxes directly, Tenant shall pay all Taxes before the date they become delinquent and shall provide to Landlord written tax receipts evidencing payment of the Taxes at least ten (10) days prior to the date such Taxes become delinquent. If Landlord elects to pay the Taxes and have Tenant reimburse Landlord for those Taxes, Tenant shall pay to Landlord on the same day as installments of Base Rent are due, as Additional Rent under this Lease, one-twelfth (1/12th) of the amount of Taxes estimated by Landlord to become due with respect to the Property for that year. On or before January 31 of each year, Landlord shall submit a statement to Tenant for the actual amount of Taxes due for the previous year, less amounts already paid by Tenant, and (a) if there is an underpayment by Tenant, Tenant shall pay such amount within fifteen (15) days after receipt of such statement thereof, or (b) if there is an overpayment by Tenant, Landlord shall credit against Rent or refund to Tenant, at Tenant's option, the difference, if any, of the Taxes paid by Tenant and the amount of actual Taxes for that year. Landlord shall promptly provide Tenant with each real property tax bill that Landlord receives from and after the Commencement Date at least thirty-five days before the date that payment to the taxing authority is due. Landlord shall pay the last tax bill issued during the Term if such tax bill covers a period of time following the expiration or earlier termination of the Term and Tenant shall reimburse Landlord for its share thereof, prorated on a daily basis. Tenant shall have the right to challenge, at Tenant's sole expense, the Taxes, and Landlord agrees to provide, whatever assistance or cooperation that Tenant may reasonably require, including Landlord agreement to sign all necessary instruments in connection with such application or appeal. Notwithstanding anything to the contrary contained herein, Taxes shall not include: (a) any inheritance, estate, succession, transfer, gift, franchise, or capital stock tax; (b) any gross or net income taxes; or (c) any excise taxes imposed upon Landlord based upon gross or net rentals or other income received by it.

7.2     **Utilities.** Tenant shall be responsible for and promptly pay all charges incurred for all utility services to the Property, including, but not limited to, telephone and telecommunication service, sanitary sewer, water, natural gas, and electricity arising out of Tenant's use, occupancy, and possession of the Property. Except in the event of Landlord's negligence or intentional misconduct, Landlord shall not be liable for any interruption or failure of utility service to the Property. Throughout the Term of the Lease, Landlord shall, upon Tenant's request, grant to the utility companies providing utilities such easements in, over and through the Property and adjacent areas as may be reasonably necessary to provide such utilities to Tenant, and Landlord will execute and acknowledge an appropriate instrument or instruments evidencing such easement or right-of-way, all at Tenant's sole expense. Landlord shall not create, grant, convey, extend, or terminate any easements or rights-of-way to the Property without the prior written consent of Tenant.

7.3    **Taxes on Tenant's Property.** Tenant shall be liable for all taxes levied or assessed against personal property, furniture, fixtures, equipment and/or other improvements placed by Tenant in the Property. If any such taxes for which Tenant is liable are levied or assessed against Landlord or Landlord's Property and if Landlord elects to pay the same or if the assessed value of Landlord's Property is increased by inclusion of personal property, furniture, fixtures, or other improvements placed by Tenant in the Property, and Landlord elects to pay the taxes based on such increase, then Tenant shall pay to Landlord on demand that part of such taxes for which Tenant is liable under this Lease.

# ARTICLE VIII
# INDEMNIFICATION

8.1    **Release of Claims.** Tenant waives all claims against Landlord Parties for injury to persons, damage to property or to any other interest of Tenant sustained by Tenant or any person resulting from any occurrence in or upon the Property, including, but not limited to, such claims for damages resulting from: (a) any equipment or appurtenances becoming out of repair; (b) the Property being out of repair; (c) injury or damage done or occasioned by wind, water, flooding, freezing, fire, explosion, earthquake, excessive heat or cold, vandalism, riot or disorder or other casualty; (d) any defect in or failure of plumbing, heating or air conditioning equipment, electric wiring or installation thereof, gas, water, steam pipes, stairs, railings or walls; (e) broken glass; (f) the backing up of any sewer pipe or downspout; (g) the bursting, leaking or running of any tank, tub, washstand, water closet, water pipe, drain, cooling coil or any other pipe or tank in, upon or about the Property; (h) the escape of steam or hot water; (i) water, snow or ice being upon or coming through the roof, skylight, trapdoor, stairs, walks or any other place upon or near the Property or otherwise; (j) the falling of any fixture, plaster or stucco; and (k) any act, omission, or negligence of occupants of adjoining or contiguous buildings or of owners of adjacent or contiguous property. Notwithstanding anything herein to the contrary, except as waived pursuant to Section 9.1 of this Lease, Tenant has not and does not waive any claims, actions, losses, damages, or expenses suffered by Tenant which are (1) caused in whole or in part by Landlord's failure to perform its covenants and obligations under this Lease or (2) caused wholly or in a material part by the negligent act or omission or willful misconduct of any of the Landlord Parties, or their respective contractors or invitees; provided, however, that the provisions of Section 9.1 of this Lease shall, to the extent contrary to the provisions of this sentence, control and supersede.

8.2    **INDEMNIFICATION OF LANDLORD PARTIES.** TENANT HEREBY AGREES TO INDEMNIFY, DEFEND AND SAVE LANDLORD PARTIES HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS, ACTIONS, DAMAGES, LIABILITIES, AND EXPENSES IN CONNECTION WITH THE LOSS OF LIFE, PERSONAL INJURY, AND/OR DAMAGE TO PROPERTY ARISING FROM OR OUT OF (A) TENANT'S NEGLIGENT ACTS OR OMISSIONS ; (B) THE OCCUPANCY, USE, OR MISUSE BY TENANT, OR TENANT'S EMPLOYEES, OF THE PROPERTY, INCLUDING THE SERVICE AREAS, PARKING AREAS, PEDESTRIAN AREAS, PEDESTRIAN WALKS, OR DRIVEWAYS; OR (C) ANY OCCURRENCE OCCASIONED BY THE VIOLATION OF ANY LAW, REGULATION OR ORDINANCE BY TENANT OR ITS AGENTS, EMPLOYEES, CUSTOMERS, INVITEES, CONCESSIONAIRES, CONTRACTORS, SERVANTS, VENDORS, MATERIALMEN, OR SUPPLIERS; NOTWITHSTANDING

7

ANYTHING CONTAINED HEREIN TO THE CONTRARY THE PROVISIONS OF THIS INDEMNITY SHALL NOT BE APPLICABLE WHEN SUCH CLAIMS, ACTIONS, LOSSES, DAMAGES, OR EXPENSES ARE DETERMINED TO HAVE BEEN CAUSED WHOLLY OR IN A MATERIAL PART BY THE INTENTIONAL OR NEGLIGENT ACT OR OMISSION OF ANY OF THE LANDLORD PARTIES. IF ANY OF THE LANDLORD PARTIES IS MADE A PARTY TO ANY LITIGATION COMMENCED BY OR AGAINST TENANT FOR ANY OF THE ABOVE REASONS, THEN TENANT SHALL INDEMNIFY, PROTECT, DEFEND AND HOLD LANDLORD PARTIES HARMLESS AND PAY ALL COSTS, PENALTIES, CHARGES, DAMAGES, EXPENSES, AND REASONABLE ATTORNEYS' FEES INCURRED OR PAID BY LANDLORD PARTIES. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, TENANT'S INDEMNIFICATION OF LANDLORD DOES NOT INCLUDE ANY LIABILITIES, LOSSES, OBLIGATIONS, DAMAGES, PENALTIES, CLAIMS, COSTS, CHARGES, AND EXPENSES ARISING FROM (A) ADVERSE ENVIRONMENTAL CONDITIONS OR IMPACTS EXISTING IN, ON OR AROUND THE PREMISES PRIOR TO THE COMMENCEMENT OF THE TERM OF THIS LEASE, (B) ADVERSE ENVIRONMENTAL CONDITIONS OR IMPACTS THAT ARE NOT CAUSED BY THE ACTS OR OMISSIONS OF TENANT, ITS AGENTS, EMPLOYEES OR CONTRACTORS, OR (C) ANY SPECIAL OR PUNITIVE DAMAGES. THE FOREGOING INDEMNITY SHALL BE IN ADDITION TO TENANT'S OBLIGATION TO SUPPLY THE INSURANCE AS REQUIRED BY ARTICLE IX OF THIS LEASE AND NOT IN DISCHARGE OF OR SUBSTITUTION FOR SAME.

<div align="center">

**ARTICLE IX**
**INSURANCE**

</div>

9.1    **Waiver of Subrogation.** Tenant hereby waives and releases any and all rights, claims, demands, and causes of action it may have against Landlord on account of any loss or damage occasioned to Tenant, its properties, real and personal, the Property, or their contents, arising from any risk or peril generally covered or coverable by standard fire and extended coverage insurance or covered or coverable by any insurance policy carried by or available to or required under this Lease to be carried by Tenant; and Tenant, on behalf of the insurance companies insuring the property of Tenant against any such loss, waives and releases any rights of subrogation that such companies insuring the property of Tenant against any such loss, may have against Landlord.

9.2    **Liability Insurance**.

(a)    During the Lease, Tenant must maintain an insurance policy insuring Tenant against liability associated with events occurring on and off the Premises with limits of coverage of not less than $500,000.00 for property damage loss from any one occurrence and not less than $1,000,000.00 for personal injury to any one person from any one occurrence (b) Garage Keepers' Liability Insurance, Tenant must maintain an insurance policy insuring Tenant and Landlord against liability for damage to and theft of customers' vehicles in the care, custody and control of Tenant. The limit coverage must not be less than $100,000.00.

(b)     Landlord must maintain commercial general liability insurance with limits of coverage of not less than $500,000.00 for property damage loss from any one occurrence and not less than $1,000,000.00 for personal injury to any one person from any one occurrence.

9.3    **Worker's Compensation Coverage.** Worker's compensation coverage insurance shall be procured by Tenant, at Tenant's cost and expense, in whatever amounts are necessary to comply with the requirements of the state of the location of the Property for Tenant's employees.

9.4    **Property Insurance.** (a) Tenant agrees, at its expense, to procure and maintain during the Term, fire and extended coverage property insurance against loss by fire and all other risks and perils as are included under so called "Special Form" (Causes of Loss - Special Form) or its then current equivalent coverage, on the Building in the full amount of the replacement value of the Building, which value shall be redetermined by Landlord at the beginning of each calendar year of the Term or any extensions thereof. It shall be the responsibility of Landlord to give Tenant written notice of such redetermined value, the obligations of Tenant hereunder being limited to the amount stated in the written notice last received by Tenant. The policy of insurance shall specifically provide that Landlord and the mortgagee or beneficiary of any mortgage or deed of trust encumbering the Property are loss payees and that all payments shall be made as their interests appear. Such coverage shall have a deductible not to exceed $25,000 per occurrence. In the event of a claim on such insurance, Tenant shall be responsible for paying the all deductible amounts and the other costs of repair or damage not covered by insurance. (b) Tenant hereby acknowledges its understanding that the Premises is located within a flood plain and that Lessor Shall not be responsible for any damages which may result from any such flooding of the Premises. Tenant shall carry flood insurance at Tenant's sole cost and expense.

9.5    **Policy Form.** All policies of insurance provided for herein to be carried by Tenant or Landlord shall be issued by insurance companies licensed to do business in the state in which the Property is located and is reasonably acceptable to Landlord, shall be issued in the names of both Landlord and Tenant as co-insureds (without any liability on the part of Landlord for premiums). Executed copies of such policies of insurance or certificates thereof shall be delivered to Landlord within ten (10) days after delivery of possession of the Property and thereafter within thirty (30) days prior to the expiration of such policy. As often as any such policy shall expire or terminate, renewal or additional policies shall be procured and maintained by Tenant in like manner and to like extent. All policies of insurance delivered to Landlord must contain a provision that the company writing said policy will give to Landlord twenty (20) days' notice in writing in advance of the effective date of any cancellation or lapse of coverage or any reduction in the amounts of insurance. The requirements of Section 9.2 shall not preclude Tenant from carrying additional liability insurance in its name and at its cost. All liability policies shall be written as primary policies, not contributing with, and not in excess of, coverage that Landlord may carry, if any.

## ARTICLE X
## ALTERATIONS AND FIXTURES

10.1    **Alterations.** During the Lease, Tenant shall have the right to make, at its sole cost and expense, such changes, alterations, improvements and additions to the Building and Property or any portion thereof as Tenant may desire, and shall also have the right to install therein and

9

replace such fixtures, signs and equipment as it may deem advisable for the conduct of its business, subject to the approval of all applicable governmental authorities, which approvals shall be obtained by Tenant at its sole cost and expense. Any alteration, improvement, modification, or fixture which is installed by either Landlord or Tenant on the Property and which is permanently attached to the floors, walls, or ceilings shall remain upon the Property when the Property. is surrendered by Tenant unless the removal by Tenant of any alterations, improvements, modifications, or fixtures made by Tenant will not result in irreparable damage to the Property. Without material out-of-pocket cost or expense to Landlord, Landlord shall cooperate with Tenant in the obtaining of any and all licenses, building permits, certificates of occupancy or other governmental approvals which may be required in connection with any such alterations and Landlord shall execute, acknowledge, and deliver any documents reasonably required in furtherance of such purposes.

10.2    **Trade Fixtures.** Notwithstanding any provision in this <u>Article X</u> to the contrary, all normal trade fixtures, equipment, shelves, racks, machinery, and furniture installed in the Property by Tenant other than replacements for fixtures, equipment, shelves, machinery, and furniture constituting fixtures that are in the Property on the Commencement Date (*"Tenant's Trade Fixtures"*) may be removed by Tenant on or before the termination date of this Lease; provided (a) Tenant is not in default under this Lease; (b) the removal shall be done in a workmanlike manner so as not to damage the structural integrity of the Building; and (c) Tenant, at Tenant's sole expense, shall repair all damage to the Property resulting from the removal of such trade fixtures, equipment, shelves, machinery and furniture. All of the Tenant's Trade Fixtures shall, for the purpose of this Lease, be treated as personal property of the Tenant, no matter how affixed, and at no time shall Landlord have any rights therein until and unless granted by a written instrument subsequent to this Lease, and executed by both Tenant and Landlord. Landlord shall execute waivers of lien on said personal property, upon request of Tenant.

10.3    **Compliance with Laws.** During the Term of this Lease, Tenant shall observe and comply with all laws, ordinances, requirements, orders, directives, rules and regulations ("*Legal Requirements*") of the federal, state, county, or municipal governments and all governmental authorities having jurisdiction over the Premises (*"Governmental Authority"* or collectively, *"Governmental Authorities"*) and which relate to Tenant's particular manner of use of the Premises. Tenant shall not be required to comply with or cure any illegal conditions which existed on the Property prior to the Commencement Date, or which are Landlord's responsibility to comply with or cure under this Lease. Landlord hereby acknowledges that the use by Tenant of the Premises may require that the parties enter into contracts or agreements with local, county, state or other Governmental Authorities or with public utilities with reference to fire safety code, storm sewer, sanitary sewer, gas, water, electric, telephone or other utility lines or connections, storm water management or easements. Landlord agrees to execute such written contracts, agreements and consents as are reasonably required for Tenant's use of the Premises. During the Term of this Lease, Landlord shall perform and/or install, at its sole cost and expense, all additions, alterations, repairs or replacements to the Premises which are required in order to comply with all public laws, ordinances, regulations, and requirements of Governmental Authorities and which are from time to time applicable to the Premises, including, without limitation, Landlord's maintenance and repair obligations (as contained in Section 5.4).

## ARTICLE XI
## MECHANIC'S AND MATERIALMEN'S LIENS

11.1 **Mechanic's and Materialmen's Liens.** Tenant shall not create or permit to be created or to remain, and will discharge by payment or bond, any lien (including, but not limited to, the liens of mechanics, laborers, artisans, or materialmen for work or materials alleged to be done or furnished in connection with the Property), encumbrance, or other charge upon the Property or any part thereof, upon Landlord's interest therein, or upon Tenant's leasehold interest; provided, that Tenant shall not be required to discharge any such liens, encumbrances, or charges as may be placed upon the Property by the act of Landlord.

## ARTICLE XII
## SIGNS; EASEMENTS

12.1 **Signs.** Tenant may, at its sole cost and expense, install signage on and about the Property, including building signage, monument, directional and pylon signs, informing the public of Tenant's business names and other commercial messages, subject only to compliance with applicable governmental laws, regulations or ordinances. For the purpose of this Lease, the signage shall be treated as personal property of the Tenant and constitute Tenant's Trade Fixtures, no matter how affixed, and at no time shall Landlord have any rights therein until and unless granted by a written instrument subsequent to this Lease, and executed by both Tenant and Landlord. Tenant shall maintain all such signage in good condition and repair.

12.2 **Easements**. Upon request of Tenant, Landlord will join with Tenant in the granting of any easement or right-of-way that may reasonably be required for utility purposes on, over or affecting the Property, provided such easement or right-of-way is of a nature and in a location that does not unreasonably interfere with the use of the Property for the purpose of which it is now designed, and Landlord will execute and acknowledge an appropriate instrument or instruments evidencing such easement or right-of-way, all at Tenant's sole expense. Landlord shall not create, grant, convey, extend, or terminate any easements or rights-of-way to the Premises without the prior written consent of Tenant.

## ARTICLE XIII
## ASSIGNMENT AND SUBLETTING; LEASEHOLD MORTGAGES

13.1 **Assignment and Subletting.**

(a) *Consent Required.* Except with respect to Permitted Transfers (defined below), which shall not require Landlord's consent, Tenant shall not assign this Lease or sublease the Property or any part thereof or estate or interest therein, or mortgage, pledge or hypothecate its leasehold interest or grant any concession or license within the Property without the prior, written consent of Landlord (which consent shall not be unreasonably withheld, delayed or conditioned) with respect to an assignment of this Lease or a sublease of the entire Property, and any attempt to do any of the foregoing without Landlord's consent shall be void. If Landlord fails to respond to Tenant's written request for consent within fifteen (15) days after Landlord's receipt thereof, Landlord will be deemed to have consented to the proposed assignment or subletting.

11

(b)     *No Release.* Consent by Landlord to one or more assignments or sublettings shall not operate as a waiver of Landlord's rights as to any subsequent assignments or sublettings. Notwithstanding Landlord's consent to subletting, in the event Tenant sublets any portion of the Property, Tenant shall remain jointly and severally liable (along with each approved subtenant who shall automatically become liable for all obligations of Tenant under this Lease) and Landlord shall be permitted to enforce the provisions of this instrument directly against Tenant and/or any subtenant without proceeding in any way against any other person. If an Event of Default (as hereinafter defined) should occur while the Property or any part thereof are then sublet, then Landlord, in addition to any other remedies provided in this Lease, at law or in equity, may, at Landlord's option, collect directly from such subtenant all rents becoming due to Tenant under such sublease, and apply such rent against any sums due to Landlord by Tenant hereunder, and Tenant hereby authorizes and directs any such subtenant to make such payments of rent directly to Landlord upon receipt of notice from Landlord. No direct collection by Landlord from any such subtenant shall be construed to constitute a novation or a release of Tenant or any guarantor of Tenant from the further performance of its obligations under this Lease. Landlord is authorized and empowered, on behalf of Tenant, to endorse the name of Tenant upon any check, draft, or other instrument payable to Tenant evidencing payment of rent, or any part thereof, and to receive and apply those proceeds in accordance with the terms of this Lease.

(c)     *Permitted Transfers.* The following shall be deemed "***Permitted Transfers***" and shall not require Landlord's prior consent or approval:

(i)     The assignment of this Lease or the subletting of the Property to any subsidiary or parent of Tenant, or any affiliate of Tenant controlled by or under common control with Tenant or Tenant's parent, provided that, in the case of an assignment, the assignee assumes in writing all of the obligations of Tenant under this Lease.

(ii)     The assignment of this Lease (whether directly or by operation of law) to any corporation or entity into which Tenant may merge or to any corporation or entity arising out of a consolidation of Tenant with another corporation or entity, or to a corporation or other entity acquiring all or substantially all of the assets of Tenant or all of the ownership interests in Tenant, provided that the assignee assumes in writing all of the obligations of Tenant under this Lease.

(iii)     The assignment of this Lease or the subletting of the Property to any party that will continue to operate the Property as it is then currently being operated (including a franchisee), provided that the assignee assumes in writing all of the obligations of Tenant under this Lease.

(iv)     Notwithstanding anything to the contrary contained herein, an assignment under this Section 13(c), so long as the assignee has assets in excess of Three Million Dollars ($3,000,000), shall release Tenant from all obligations of the Tenant under this Lease.

13.2    **Transfer of Landlord's Interest**. In the event of the transfer by Landlord of its interest in this Lease or the Property, Landlord shall be released from any future obligations under this Lease accruing after the date of such transfer, and Tenant agrees to look solely to Landlord's successor in interest for performance of the obligations of "Landlord" under this Lease.

13.3    **Leasehold Mortgage.** Tenant may from time to time, and without the consent of Landlord, secure financing or general credit lines from banks, insurance companies or other lenders, granting to such lenders as security for such financing or general credit lines a mortgage encumbering Tenant's leasehold interest in the Property (which may include a collateral assignment of Tenant's leasehold interest in the Property with rights of reassignment, hereinafter a "***Leasehold Mortgage***") and/or a security interest in any movable or removable furnishings, fixtures, equipment and personalty purchased by or belonging to Tenant, or leased from third parties by Tenant and installed on the Property by Tenant (whether or not affixed), including, but not limited to, Tenant's lighting fixtures, counters and counter tops, chairs, tables (including all public seating components), décor items, fans, stoves, ovens, broilers, refrigerators, bars, walk-in cold storage boxes, restaurant and office equipment, software and other personal property (collectively, "***Tenant's FF&E***").

(i)    Upon request of Tenant, Landlord agrees to execute such documents or instruments as shall evidence Landlord's consent to a Leasehold Mortgage and/or security interest and give such lenders the same right to notice of and time to cure any default of Tenant as is provided Tenant under the provisions of this Lease. Landlord and Tenant agree to execute or make such further modifications or amendments to this Lease as a prospective or existing holder of any Leasehold Mortgage may request, provided that any such modification or amendment shall not materially and adversely modify any material terms of this Lease. A failure of Landlord to respond in writing to such a request for consent within twenty (20) days of such request shall be deemed consent by Landlord to such request or an acceptance of such document, as the case may be.

(ii)    Landlord shall give to the then holder of any Leasehold Mortgage (provided such holder shall have given to Landlord a notice specifying such holder's name and address) a copy of any notice, consent, approval, request, demand or communication given to Tenant under this Lease at the same time as and whenever any such notice shall thereafter be given by Landlord to Tenant, and no such notice by Landlord shall be deemed to have been duly given to Tenant unless and until a copy thereof shall have been so given to such holder.

(iii)    If Landlord shall give any such notice, such holder shall (provided it notifies Landlord of its intention to do so) thereupon have the right to remedy a default by Tenant ("***Default***") or to cause such Default to be remedied for a period of thirty (30) days (or five (5) days in the case of monetary Default) more than is given Tenant hereunder to remedy such Default or to cause such Default to be remedied. Landlord will accept performance by such holder with the same force and effect as though performed by Tenant. No such Default shall be deemed to exist and Landlord shall not exercise any rights it may have as a result of such Defaults as long as such holder shall, in good faith,

13

have commenced promptly to cure the claimed Default and to prosecute the same to completion with diligence and continuity. The time in which such holder may cure any Default which is not susceptible of being cured by the payment of a sum of money, shall be deemed extended to include the period of time required by said holder: (i) to obtain possession of the Premises with due diligence, or (ii) if such Default is not susceptible of being cured by such holder upon obtaining such possession, to institute and complete foreclosure proceedings or otherwise acquire the Tenant's estate hereunder; provided, however, that during any such period all of the other obligations of Tenant under this Lease to the extent they are reasonably susceptible of being performed by such holder are being performed.

<div align="center">

**ARTICLE XIV**
**QUIET ENJOYMENT**

</div>

14.1    **Quiet Enjoyment.** Tenant, upon payment of all Rent and other sums herein provided and upon compliance with the performance of all those provisions, terms, and conditions applicable to and performable by Tenant, shall peaceably and quietly hold occupy, and enjoy the Property for the Term without hindrance, ejection, or interruption by Landlord, or persons lawfully or equitably claiming under or through Landlord; provided that this covenant shall be binding upon Landlord and its successors and assigns only with respect to breaches occurring during its or their respective ownership of Landlord's interest hereunder.

<div align="center">

**ARTICLE XV**
**RIGHT OF ACCESS**

</div>

15.1    **Right of Access.** Landlord and/or Landlord's agents shall have the right, but not the obligation, to enter the Property upon seventy-two (72) hours advance oral notice to Tenant (except in an emergency) to examine the same and to make such repairs, alterations, improvements, or additions as it is required to make under the terms of this Lease or that Tenant has failed to make in accordance with the terms of this Lease, and Landlord shall be allowed to take all materials into and upon the Property that may be required therefor without the same constituting an eviction of Tenant, actual or constructive, and the Rent shall in no way abate while such repairs, alterations, improvements, or additions are being made, by reason of loss or interruption of business of Tenant; provided, however, that Landlord shall not unreasonably interfere with the normal business operations of Tenant.

<div align="center">

**ARTICLE XVI**
**SURRENDER; HOLDING OVER**

</div>

16.1    **Surrender.**

(a)    *Condition at Surrender*. Except as otherwise provided herein, at the end of the Term or termination of Tenant's right to possession of the Property, Tenant will at once surrender and deliver up the Property to Landlord, broom clean and in good condition, ordinary wear and damage by fire or other casualty excepted (unless this Lease is terminated as a result of casualty, condemnation or <u>Sections 5.2 and 5.3</u>, then in accordance with Article XIX or XX, as applicable).

<div align="center">

14

</div>

(b)     *Removal of Tenant's Property.* Upon the end of the Term or termination of Tenant's right to possession of the Property, Tenant may remove or cause to be removed all of Tenant's Property (as hereinafter defined) (including, without limitation, all of Tenant's Trade Fixtures), which removal shall be done in a good, workmanlike and lien-free manner, and upon such removal Tenant shall repair all damage to the Property caused by the installation or removal of such items (including the removal of any and all floor bolts). If Tenant does not remove any items comprising Tenant's Trade Fixtures or other property belonging to Tenant prior to the end of the Term, then Landlord may remove such items.

16.2    **Holding Over.** Should Tenant remain in possession of the Property, or any part thereof, after termination of this Lease (whether by the expiration of the Term or otherwise) without the execution of a new lease by Landlord and Tenant, then Tenant, at the option of Landlord, shall become a tenant from month-to-month of the Property, or any part thereof, and under all other terms, conditions, provisions, and obligations of this Lease insofar as the same are applicable to a tenancy from month-to-month except that the rent payments shall be equal to one hundred twenty-five percent (125%) of the last rent payments scheduled under the prior Term or extension period.

## ARTICLE XVII
## EVENTS OF DEFAULT; LANDLORD'S REMEDIES

17.1    **Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" (herein so called) by Tenant under this Lease:

(a)     Failure of Tenant to pay when due an installment of Base Rent, Additional Rent or any other amount payable to Landlord hereunder, and the continuation of that failure for a period of fifteen (15) days after Landlord's delivery of written notice thereof to Tenant.

(b)     Failure of Tenant to comply with any term, condition or covenant of this Lease, and the continuation of that failure for a period of thirty (30) days after Landlord's delivery of written notice thereof to Tenant; provided that, if such failure is of a nature that is not reasonably susceptible to cure within thirty (30) days, Tenant shall have such additional time to cure the failure as is reasonably necessary, as long as Tenant commences such cure within thirty (30) days and thereafter diligently pursues such cure.

17.2    **Landlord's Remedies.**

(a)     If Tenant shall have failed to cure a default by Tenant after expiration of the applicable time for cure of a particular default, Landlord may, at its election, but without obligation therefor, (a) seek specific performance of any obligation of Tenant, after which Landlord shall retain, and may exercise and enforce, any and all rights which Landlord may have against Tenant as a result of such default, (b) from time to time without releasing Tenant in whole or in part from Tenant's obligation to perform any and all covenants, conditions and agreements to be performed by Tenant hereunder, cure the default at Tenant's cost, and/or (c) exercise any other remedy given hereunder or now or hereafter existing at law or in equity or by statute. Any reasonable cost incurred by Landlord in order to cure such a default by Tenant shall be due immediately from Tenant, together with interest. In all events Landlord shall use its best

efforts to re-lease the Premises for such term at such rental and upon such other terms and conditions as may be reasonably necessary or appropriate to mitigate damages, with the right to make alterations and repairs to the Premises. If Landlord is entitled to monies representing all or part of future payments of rent hereunder, such amounts shall be discounted to current value based upon the interest rate in effect on the date of such award. No property or assets of Tenant's members, partners, shareholders, principals, officers or directors, direct or indirect, disclosed or undisclosed, shall be subject to levy, execution or other enforcement procedure for the satisfaction of Landlord's remedies under or with respect to this Lease. In no event shall Landlord bring any action against any of Tenant's members, managers, limited partners, shareholders, directors, officers and principals, direct and indirect, for any claims arising out of the Lease.

(b)    Forbearance by Landlord to enforce one or more of the remedies available to it on an Event of Default does not constitute a waiver of that default or of the right to exercise that remedy later or of any rent, damages or other amounts due to Landlord hereunder.

(c)    Anything to the contrary herein notwithstanding, Landlord hereby expressly waives any and all rights granted by or under any present or future laws (whether common law, statutory, or otherwise) to any lien or claim of any nature in Tenant's FF&E for rent, or to levy or distrain for rent, in arrears, in advance, or both, upon Tenant's FF&E.

(d)    If at any time and from time to time a dispute shall arise as to any amount or sum of money to be paid by one party to this Lease to the other party to this Lease or any work to be performed by either Landlord or Tenant under the provisions of this Lease, the party against whom the obligation to pay or perform is asserted shall have the right to make payment or perform such work and pay the costs thereof "under protest", and such payment or performance shall not be regarded as a voluntary payment or performance and the right of that party to institute suit to recover the amount paid or performed or both "under protest" shall survive. If it is determined that there was no obligation on the part of the party to pay or perform or both or if it is determined that the right to require such payment or performance, or both was barred, the party that paid or performed or both shall be entitled to recover the amount paid "under protest", plus interest thereon at the rate equal to the lesser of eighteen percent (18%) per annum or the maximum interest rate permitted by law from the date such payment, performance or both was made until the date that reimbursement is received.

17.3    **Attorneys' Fees.** In the event that Tenant defaults in the performance of any of the terms, covenants, agreements, or conditions contained in this Lease and Landlord places the enforcement of this Lease, or any part thereof, or the collection of any rent or charge due, or to become due, or the recovery of the possession of the Property, in the hands of attorneys, or files suit upon the same, Tenant agrees to pay Landlord's reasonable attorneys' fees.

## ARTICLE XVIII
## SUBORDINATION AND ATTORNMENT

18.1    **Subordination and Attornment.**    Landlord shall have the right to transfer, assign, mortgage and convey in whole or in part the Property and any and all of its rights under this Lease, and nothing herein shall be construed as a restriction upon Landlord's doing so.

Tenant hereby subordinates this Lease and all rights of Tenant hereunder to any mortgage or deed of trust, and all renewals, substitutions and extensions thereof, that is now or may hereafter be placed on the Property covered by this Lease; provided that the holder of such mortgage delivers to Tenant subordination, non-disturbance and attornment agreement for the benefit of Tenant in form and substance reasonably acceptable to Tenant, that as long as Tenant is complying with its obligations under this Lease, Tenant's possession will not be disturbed. Any lease to which this Lease is, at the time referred to, subject and subordinate is herein sometimes called a "superior lease" and the lessor of a superior lease or its successor in interest, at the time referred to, is herein sometimes called a "superior lessor"; and any mortgage to which this Lease is, at the time referred to, subject and subordinate is herein called "superior mortgage" and the holder of a superior mortgage is herein called "superior mortgagee". Notwithstanding the foregoing, the holder of any mortgage may elect that this Lease shall have priority over its mortgage and upon notification of Tenant by such holder, this Lease shall be deemed to have priority over such mortgage regardless of the date of this Lease. Tenant further covenants and agrees that, if any person or entity acquires the Property as a purchaser at any foreclosure sale (any such mortgagee or other lienholder or purchaser at a foreclosure sale being each hereinafter referred to as the "***Purchaser at Foreclosure***" or "***Purchaser***"), Tenant shall on the written request of the Purchaser at Foreclosure, attorn to the Purchaser and will perform for the Purchaser's benefit all the provisions of this Lease to be performed by Tenant with the same force and effect as if the Purchaser were the Landlord originally named in this Lease. The Purchaser at Foreclosure shall not be liable for any act or omission of any prior landlord, subject to any offsets, claims, or defenses that Tenant might have against any prior landlord, or bound by any Rent that Tenant might have paid more than one (1) month in advance or any amendment to this Lease made without its prior written consent. Tenant agrees to execute a certificate or instrument, including without limitation the Tenant estoppel letter described in <u>Section 18.2</u> below, that may be deemed, in Landlord's sole discretion, necessary to further effect the subordination of this Lease to such mortgage or superior lease or to confirm any election to continue the Lease in effect in the event of foreclosure, as provided above. Tenant hereby constitutes and appoints Landlord as Tenant's attorney-in-fact to execute any such certificate or instrument, including the Tenant estoppel letter described in <u>Section 18.2</u> below, for and on behalf of Tenant.

18.2 **Estoppel Letters.**

(a) Within thirty (30) days after Landlord's request, from time to time, Tenant shall execute and deliver to Landlord or to a mortgagee or prospective purchaser, as directed by Landlord, a statement in writing, in a form acceptable to Landlord, certifying, among other things, that: (i) Tenant is in possession of the Property; (ii) the Lease is in full force and effect and has not been amended, modified or superseded; (iii) there is no existing default; (iv) Rent has not been paid more than one month in advance; and (v) Tenant has no claim against Landlord which might be offset against accruing Rent.

(b) Within thirty (30) days after Tenant's request, from time to time, Landlord shall execute and deliver to Landlord or to a leasehold mortgagee or prospective assignee, as directed by Tenant, a statement in writing, in a form acceptable to Tenant, certifying, among other things, that that this Lease is unmodified and in full force and effect (or, if there have been modifications, that this Lease is in full effect as modified, and setting forth such modifications)

and the dates to which the Rent, and other sums payable hereunder have been paid, and either stating that to the knowledge of the signer of such certificate, no default of which the signer may have knowledge shall have occurred (or, if a default shall have occurred, stating the nature of such default).

## ARTICLE XIX
## CASUALTY AND CONDEMNATION

19.1  **Fire and Casualty Damage.** If the Property, or any part thereof, is damaged by fire or other casualty, then Tenant shall give prompt written notice thereof to Landlord. If the Property is damaged or destroyed by fire or other casualty and (a) the alteration or reconstruction of the Property shall, in Tenant's reasonable opinion, require one hundred eighty (180) or more days to effectuate all necessary repairs and reconstruction (whether or not the Property shall have been damaged by such fire or other casualty) or (b) such damages or destruction shall occur during the last five (5) years of the Term, then Tenant may, at its option, terminate this Lease as to the Property by notifying Landlord, in writing, of such termination within sixty (60) days after the date of the casualty ("***Termination Notice***"). If Tenant does not elect to terminate this Lease as to the Property, then Tenant shall commence to repair and restore the Property to substantially the same condition as existed immediately before the happening of the casualty, except that Tenant's work shall not exceed the scope of the work done in originally constructing the Property, and Landlord will agree that all insurance proceeds shall be remitted to Tenant for such purpose. Rent shall be tolled during the repair of such damage; provided, however, Tenant may, at its option, continue to operate its business on the Property during any such period to the extent reasonably practical from the standpoint of prudent business management. In such event, rent shall be abated in proportion to the percentage of the Property or Building actually being utilized during the abatement period. If, however, Tenant elects to terminate the Lease, the Lease shall terminate effective as of the date of the Termination Notice, and Tenant shall cause all insurance proceeds from the property insurance policy (other than insurance proceeds allocable to Tenant's personal property, fixtures and equipment) to be remitted to Landlord.

19.2  **Condemnation.**

(a)  *Major Taking.* If during the Term the whole or substantially the whole of the Property should be taken for any public or quasi-public use under any governmental law, ordinance, or regulation, or by right of eminent domain, or should be sold to a condemning authority in lieu of condemnation, such that (i) any portion of the Building is taken, (ii) the taking is such that Tenant, in Tenant's sole discretion, can no longer conduct business at the Property in substantially the same manner as prior to the taking, (iii) access to public streets is restricted, or (iv) ten percent (10%) or more of the parking spaces available on the Property are no longer able to be utilized or any portion of the parking area serving the Property, the effect of which taking would cause the Property to have a parking area below that for which the Property is zoned or otherwise below that which is legally required (each a "***Major Taking***"), then Tenant shall have the option to terminate this Lease as to the Property effective as of the date of such Major Taking and the award in the Major Taking (the "***Taking Award***") will be distributed as follows: (i) first, to the payment of all reasonable fees and expenses incurred in collecting such award, (ii) second, to Tenant in an amount equal to the unamortized cost of the leasehold improvements (assuming that such leasehold improvements are amortized on a straight-line basis

18

over the Lease Term) and the Tenant's removal expenses, business dislocation damages, and moving expenses, (third, to Tenant in an amount equal to the value of Tenant's leasehold interest in the Property, and (iv) the balance of the Taking Award shall be distributed to Landlord. Any Rent paid in advance of the termination of the Lease shall be proportionately refunded as of as of the date of such Major Taking. After the determination and distribution of the Taking Award as herein provided, and the termination of this Lease, the Landlord and Tenant shall have no further rights, duties or obligations under this Lease.

(b)     *Minor Taking.* If less than the whole or substantially the whole of the Property is taken for any public or quasi-public use under any governmental law, ordinance, or regulation, or by right of eminent domain, or should be sold to a condemning authority in lieu of condemnation, and such taking is not a Major Taking (referred to herein as a "***Minor Taking***"), then (i) the Taking Award shall be paid into escrow with and held by a national title agency (the "***Title Company***") located in the general area where the Property is located and to be selected by Landlord and Tenant in their reasonable discretion (or, if Landlord and Tenant are unable to so agree, as selected by the American Arbitration Association located in the area where the Property is located), and (ii) such proceeds shall be disbursed by the Title Company in progress payments to for the purpose of reimbursing Tenant for its cost of repairing or restoring the Property as provided herein, and Tenant shall restore and reconstruct the Property to substantially its former condition to the extent reasonably possible; but Tenant shall not be obligated to incur any cost in excess of the Taking Award. Notwithstanding the foregoing, if, in Tenant's reasonable determination made within thirty (30) days after the Minor Taking, the Property cannot be adequately restored with the available proceeds or award from the Minor Taking, such Minor Taking shall be considered a Major Taking, and the provisions of Section 19.2(b) shall govern. In the event of any Minor Taking, Rent shall be abated as follows: while any construction work is being completed, Base Rent will be abated by a percentage equal to the percentage decrease of sales on a monthly basis when compared to average sales in the same month in the prior two (2) years ("***Interim Abated Rent***"). The Interim Abated Rent shall remain effective until the rehabilitation of the Property is complete. Once the Property is rehabilitated, a permanent rent abatement will be determined twelve (12) months after completion of all rehabilitation, at which time Base Rent will be decreased by a percentage equal to any percentage of decreased sales in the twelve (12) month period as compared to the average sales for the two (2) years prior to the taking ("***Permanent Abated Rent***").

(c)     *Tenant's Right to Claim Taking Award.* Notwithstanding anything to the contrary contained herein, Tenant shall be entitled to claim, prove, and receive in the condemnation proceedings, such separate award as may be allowed for Tenant's FF&E and for its adjusted book value as of the date of the taking of its improvements (excluding trade fixtures) made to the Property. In computing its adjusted book value, improvements will be conclusively presumed to have been depreciated or amortized for federal income tax purposes over their useful lives with a reasonable salvage value.

(d)     *Cooperation.* Landlord and Tenant shall promptly notify the other of the commencement of any eminent domain, condemnation, or other similar proceedings with regard to the Property. Landlord and Tenant covenant and agree to fully cooperate in any condemnation, eminent domain, or similar proceeding in order to maximize the total award receivable in respect thereof.

## ARTICLE XX
## WAIVER OF LANDLORD'S LIEN

20.1    **Waiver of Landlord's Lien.** Notwithstanding any other provision hereof to the contrary, Landlord hereby waives and releases any contractual or statutory landlord's lien provided by Applicable State Law against Tenant's personal property and Tenant's Trade Fixtures situated in and upon the Property (*"Tenant's Property"*).

## ARTICLE XXI
## RIGHT OF FIRST REFUSAL

21.1    **Right of First Refusal.** Tenant is hereby granted, upon the conclusion of the first (1st) Lease year, for the remainder of the Term (or the Extension Term), the "Right of First Refusal" (herein so called) to purchase the Property on the same terms as set forth in an offer from a third party as set forth below. If Landlord receives a bona fide offer from a third party to purchase the Property on terms Landlord is willing to accept, Landlord shall communicate, in writing, the terms and conditions of such proposal to Tenant (*"Landlord's Notice"*), and Tenant shall (i) have a period of seven (7) days after receipt of Landlord's Notice within which to exercise, by delivery of written notice thereof to Landlord, the Right of First Refusal to purchase the Property on the identical terms, conditions and price as set forth in Landlord's Notice, and (ii) within an additional fifteen (15) days following Tenant's exercise of the Right of First Refusal, execute an appropriate purchase agreement, reflecting the terms and conditions contained in Landlord's Notice (the *"Purchase Agreement"*). Tenant's failure to timely exercise the Right of First Refusal, or Tenant's failure to timely execute the Purchase Agreement and close the purchase of the Property as set forth in the Purchase Agreement, as required by the preceding sentence, shall release Landlord from any restriction on Landlord's selling the Property on the terms and conditions set forth in the corresponding Landlord's Notice, during the period of one hundred eighty (180) days from the original date of that Landlord's Notice (the *"Sale Period"*). If Landlord does so enter into an agreement to sell the Property on the terms and conditions set forth in the Landlord's Notice during the Sale Period, the Right of First Refusal shall automatically terminate. However, in the event Landlord does not enter into an agreement to sell the Property on the terms and conditions set forth in the Landlord's Notice during the Sale Period, the Property shall not thereafter be sold during the initial Term hereof without Landlord's compliance with the terms of this Section 21.1.

## ARTICLE XXII
## MISCELLANEOUS PROVISIONS

22.1    **Notice.** Any notice or request (hereinafter severally and collectively called *"Notice"*) in this Lease provided for or permitted to be given, made or accepted by any party to the other must be in writing, and may, unless otherwise in this Lease expressly provided, be given or be served by depositing the same in the United States mail, postpaid and certified and addressed to the party to be notified, with return receipt requested, or by delivering the same in person to such party (or, in the case of a corporate or partnership party, to an officer or general partner of such party, as the case may be), or by prepaid telegram, when appropriate, addressed to the party to be notified. Notice deposited in the mail in the manner hereinabove described shall be effective, unless otherwise stated in this Lease, from and after the date it is so deposited.

Notice given in any other manner shall be effective only if and when received by the party to be notified. For purposes of Notice, the addresses of the parties shall, until changed as herein provided, be as follows:

<div style="padding-left: 2em;">

For Landlord:            Montileone Properties, LLC
5228 S Aviemore Dr.
Springfield, MO 65809
Tel.:   414-849-3702
tjmontileone@mchsi.com

For Tenant:             AAMCO Transmissions & Total Car Care Inc.
Attn: Legal Department
201 Gibraltar Road,
Horsham, PA 19044

with a copy to:

Brown Rudnick LLP
185 Asylum Street
Hartford, Connecticut 06103
Attn: Thomas J. Regan, Esq.
tregan@brownrudnick.com

</div>

Landlord and Tenant may, from time to time and at any time, change their respective addresses by at least fifteen (15) days written notice to the other party, delivered in compliance with Section 22.1.

22.2    **Force Majeure.** If either party hereto shall be delayed or prevented from the performance of any act required hereunder by reason of acts of God, strikes, lockouts, labor troubles, inability to procure materials, Laws, adverse weather, unusual delay in transportation or other cause without fault and beyond the control of the party obligated (financial inability excepted), then upon written notice to the other party, the performance of such act shall be excused for the period of the delay and the period for the performance of such act shall be extended for a period equivalent to the period of such delay; provided, however, Tenant and/or Landlord shall exercise its best efforts to remedy any such cause of delay or cause preventing performance.

22.3    **Use of Language.** Words of any gender used in this Lease include any other gender, and words in the singular include the plural, unless the context otherwise requires.

22.4    **Captions.** The captions or headings of paragraphs in this Lease are inserted for convenience only, and shall not be considered in construing the provisions hereof if any question of intent arises.

22.5    **Successors.** The terms, conditions and covenants contained in this Lease inure to the benefit of, and are binding on, the parties hereto and their respective successors in interest, assigns and legal representatives, except as otherwise herein expressly provided. All rights, powers, privileges, immunities and duties of Landlord under this Lease, including without

limitation, notices required or permitted to be delivered by Landlord to Tenant hereunder, may, at Landlord's option, be exercised or performed by Landlord's agent or attorney.

22.6    **Severability.** If any provision of this Lease is finally held by a court of competent jurisdiction to be invalid or unenforceable, then the invalid or unenforceable provision shall be deemed severed from this Lease and the validity and enforceability of the remaining provisions of this Lease shall be unaffected.

22.7    **Personal Liability.** Landlord's liability to Tenant for any default by Landlord under this Lease is limited to Landlord's interest in the Property, and Tenant agrees to look solely to Landlord's interest therein for the recovery of any judgment against Landlord, it being intended that neither Landlord nor any of its partners, shareholders, agents, affiliates, officers or directors shall be personally liable for any judgment or deficiency.

22.8    **Damage From Certain Causes.** Landlord is not liable or responsible to Tenant for any loss or damage to any property or person occasioned by theft, fire, act of God, public enemy, injunction, riot, strike, insurrection, war, court order, requisition, or order of Governmental Authority, or for any damage or inconvenience that may arise through repair or alteration of any part of the Property, or a failure to make any such repairs, unless such damage is caused by Landlord's negligence or willful misconduct.

22.9    **Intentionally Deleted.**

22.10    **Governing Law.** This Lease and the rights and obligations of the parties hereto shall be interpreted, construed, and enforced in accordance with Applicable State Law.

22.11    **Right to Cure; Tenant's Remedies.** If Landlord shall have either (i) failed to perform or deliver a service as required under this Lease, (ii) failed to perform a repair or replacement required to be made by Landlord under this Lease, or (iii) failed to cure a default by Landlord after expiration of the applicable time, if any, for cure of a particular default, Tenant may, at its election, but without obligation therefor (a) seek specific performance of any obligation of Landlord, after which Tenant shall retain, and may exercise and enforce, any and all rights which Tenant may have against Landlord as a result of such default, (b) from time to time without releasing Landlord in whole or in part from Landlord's obligation to perform any and all covenants, conditions and agreements to be performed by Landlord hereunder, cure the default at Landlord's cost, (c) exercise any other remedy given hereunder or now or hereafter existing at law or in equity or by statute. Any reasonable cost incurred by Tenant in order to cure such a default by Landlord shall be due immediately from Landlord, together with interest. If Landlord fails to reimburse Tenant as provided herein, Tenant shall have the right to deduct from the Base Rent due hereunder any amounts due from Landlord pursuant to this Section 22.11.

22.12    **Memorandum of Lease.** At Tenant's option at any time after the execution of this Lease, Landlord and Tenant shall execute, acknowledge and deliver a Memorandum of this Lease (the "*Memorandum of Lease*"), in the form attached hereto as Exhibit B and made a part hereof for all purposes, which Memorandum of Lease shall be recorded by Tenant in the real property records of the county where the Site is located.

22.13  **No Partnership.** Notwithstanding anything else to the contrary, Landlord is not and under no circumstances shall it be considered to be a partner of Tenant or engaged in a joint venture with Tenant.

22.14  **No Oral Changes.** This Lease may not be changed or terminated orally, but only in writing executed by both parties hereto.

22.15  **ENTIRETY; NO REPRESENTATIONS AND WARRANTIES.** THIS LEASE EMBODIES THE ENTIRE AGREEMENT BETWEEN THE PARTIES AND SUPERSEDES ALL PRIOR AGREEMENTS AND UNDERSTANDINGS, INCLUDING ANY LETTERS OF INTENT, IF ANY, RELATING TO THE SUBJECT MATTER HEREOF. LANDLORD HAS NOT MADE, AND TENANT MAY NOT RELY ON, ANY REPRESENTATIONS OR WARRANTIES WITH REGARD TO THE PROPERTY, EXPRESSED OR IMPLIED, EXCEPT AS STATED IN THIS LEASE. IN PARTICULAR, LANDLORD HAS NOT AUTHORIZED ANY AGENT OR BROKER TO MAKE A REPRESENTATION OR WARRANTY IN ADDITION TO OR INCONSISTENT WITH THE TERMS OF THIS LEASE AND TENANT MAY NOT RELY ON ANY SUCH ADDITIONAL OR INCONSISTENT REPRESENTATION OR WARRANTY.

22.16  **Landlord's Environmental Representations and Warranties.** Landlord hereby represents and warrants to Tenant that, as of the Effective Date of this Lease: no Hazardous Substance has been manufactured, generated, installed, used, stored, handled, treated, disposed, released, or located at, in, on, beneath, or migrating to or from the Premises at any time during the period of Landlord's ownership or occupation of the Premises or, to Landlord's knowledge after due inquiry, at any time prior to Landlord's ownership or occupation of the Premises, which Hazardous Substance, if discovered at, in, on, beneath or migrating to or from the Premises, or improperly disposed of off of the Premises, would subject the owner or occupant of the Premises to costs, damages, penalties, liabilities or an obligation to perform any work, cleanup, removal, repair, investigation, construction, alteration, demolition, renovation or installation in or in connection with the Premises ("***Environmental Cleanup Work***") in order to comply with any federal, state or local law, statute, regulation, ordinance, order, decree, directive, or judgment relating to the environment, human health and safety, preservation or reclamation of natural resources, the management, use, generation, treatment, storage, disposal, manufacture or release of Hazardous Substances, or to the condition or quality of the Premises ("***Environmental Law***"), including, but not limited to Environmental Laws applicable to owners, operators or developers of real property. Landlord further represents and warrants that no notice from any Governmental Authority has ever been served upon Landlord, its agents or employees, or, to Landlord's knowledge after due inquiry, any occupant or prior owner of the Premises, or any portion thereof, claiming any violation of any Environmental Law, or requiring or calling attention to the need for any Environmental Cleanup Work at, in, on, beneath, or otherwise in connection with the Premises in order to comply with any Environmental Law, and neither Landlord, its agents or employees, nor, to the best of Landlord's knowledge after due inquiry, any occupant or prior owner of the Premises, has ever been informed of any threatened or proposed serving of any such violation or corrective work order. To Landlord's knowledge, the Premises, including the soil, groundwater and other environmental media, at, in, on, or beneath the Premises, is free of any Hazardous Substance.

22.17 **Landlord's Environmental Covenants.** Landlord hereby covenants to Tenant that, during the Term of this Lease, Landlord, at its sole cost and expense, shall perform all work required (i) to comply with any Environmental Law governing the Premises, and (ii) as a result of the environmental state, condition and quality of the Premises, including, but not limited to, the costs of any Environmental Cleanup Work and the preparation of any closure or other required plans, excluding, however, any Environmental Cleanup Work related to Hazardous Substances on the Premises conclusively established to have been introduced to the Premises by Tenant, its agents or employees (collectively, "***Landlord's Environmental Obligations***"). Landlord shall indemnify, defend and hold harmless Tenant, its directors, officers, partners, employees, agents, successors, assigns, and lenders from and against any and all claims, actions, damages, penalties, fines, costs, liabilities and expenses and losses of any kind, including, but not limited to, reasonable attorneys' fees, which are directly or indirectly in whole or in part caused by, or arise out of, Landlord's Environmental Obligations. If Landlord is required to perform any Environmental Cleanup Work as provided above and if, as a result of an order issued by a Governmental Authority, Tenant is not legally permitted to continue to conduct its business from the Premises during the period of such Environmental Cleanup Work, in addition to all other remedies provided herein, Base Rent, Additional Rent and any other charges payable by Tenant hereunder shall fully abate until Landlord has caused the Premises to comply with all Environmental Laws and Tenant is legally permitted to resume conducting its business from the Premises, and, if the same cannot be reasonably completed within thirty (30) days after Tenant is or will be required to so suspend conducting its business, Tenant shall also have the right to terminate this Lease by written notice to Landlord, such termination to be effective as of the date of notice, in which event this Lease shall become null and void and neither party shall have any further obligations hereunder. If Landlord fails to perform Landlord's Environmental Obligations hereunder, Tenant may at its option (but shall not be required to) perform such obligations on Landlord's behalf, and the actual and reasonable costs thereof may be offset against the Base Rent. The obligations of Landlord under this Section 22.17 shall survive the expiration or earlier termination of this Lease.

22.18 **Financial Statements**. A maximum of one (1) time, in any twelve (12) month period, upon Landlord's written request, Tenant shall promptly furnish to Landlord financial statements prepared by Tenant that reflect the Tenant's gross sales at the Property.

*[Remainder of page intentionally left blank. Signature page(s) to follow.]*

EXECUTED as of the 21th day of October, 2018.

**TENANT**: AAMCO TRANSMISSIONS, LLC

By:
Name:
Title:

**LANDLORD**: MONTILEONE PROPERTIES, LLC

By:
Name: Tim Montileone
Title: President

EXECUTED as of the 29 day of OCT , 2018.

**TENANT**: AAMCO TRANSMISSIONS, LLC

By:_____

Name: _____

Title: _____

**LANDLORD**: MONTILEONE PROPERTIES, LLC

By:_____

Name: Tim Montileone

Title: President

*Exhibit A*

### LEGAL DESCRIPTION OF THE SITE
### AND SITE PLAN

**PROPERTY INFORMATION**

The subject property is a corner lot located on the north side of Manchester Road and west of Helen Avenue. The site is 0.37 acres or 16,083 square feet in size. The property has access from Helen Avenue and Manchester Road. As previously noted, the property is zoned "GC" General Commercial. Property to the north is zoned "B" Single-Family Residential, property to the south zoned "LID" Light Industrial, and property to the east and west is zoned "GC" General Commercial. The property is located in the AE Floodway Area. The property includes an 8' privacy fence along the rear property line to meet the screening devise requirement between commercial and residential zoned properties.

### <u>TAX LOCATOR NUMBER 21K240151</u>



*Exhibit B*

**FORM OF MEMORANDUM OF LEASE**

**MEMORANDUM OF LEASE**

STATE OF_____          §
                                 §
COUNTY OF_____             §

      THIS MEMORANDUM OF LEASE (this *"Memorandum"*) is entered into as of _____, 201_, by and between _____ *("Landlord"*) and _____ (*"Tenant"*).

<p align="center">RECITALS:</p>

      A.    Landlord and Tenant have entered into that certain Lease Agreement dated as of _____ (the *"Lease"*) with respect to certain real property located in _____County, _____, more particularly described in <u>Exhibit A</u> attached hereto (*"Property"*);

      B.    Landlord and Tenant desire to evidence of record certain of the terms of the Lease, as more fully set forth hereinbelow; and

      C.    Capitalized terms used but not defined herein shall have the meanings attributed to same in the Lease.

      NOW, THEREFORE, KNOW ALL MEN BY THESE PRESENTS:

      THAT LANDLORD and TENANT, for and in consideration of the Property and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, do hereby agree as follows:

      1.    The Lease is for an initial term ending on _____, 201_, which term may be extended in accordance with the terms of the Lease for up to two (2) additional renewal terms of five (5) years each.

      2.    The Lease provides for the payment of certain rents by Tenant to Landlord, and sets forth certain covenants and agreements between Tenant and Landlord all as more particularly described therein.

      3.    The Lease also provides that Landlord has granted to Tenant a right of first refusal to purchase the Property if Landlord receives a bona fide offer from a third party to purchase the Property on terms Landlord is willing to accept. The terms of the right of first refusal are more particularly set forth in the Lease.

<p align="center">***[Remainder of page intentionally left blank. Signature page(s) to follow.]***</p>

EXECUTED as of the _____ day of _____, 201_.

TENANT:

By:_____
Name: Tim Montileone
Title: President

*[add appropriate state acknowledgement]*

LANDLORD:

By:_____
Name: _____
Title: _____

*[add appropriate state acknowledgement]*

63167190 v6

24SL-CC02642

**From:** "Jordan Zucker" <JZucker@americandriveline.com>
**To:** "Tim Montileone" <tjmontileone@mchsi.com>
**Sent:** Monday, February 5, 2024 7:11:23 AM
**Subject:** RE: Read: Rent

Hi Tim.  Had this email open from Friday right when you returned my call.

As we discussed, the Brentwood lease (Section 3) shows a 10-day grace period before any alleged rent is due before fees or interest may be assessed.

I anticipate we'll be in further contact during this period.  Hope you had a good weekend.

Jordan Zucker

Vice President – Law

American Driveline Systems / AAMCO Transmissions

jzucker@americandriveline.com

D: (267) 464.7263

410 Horsham Road, Suite 105, Horsham, PA 19044

**From:** Tim Montileone <tjmontileone@mchsi.com>
**Sent:** Friday, February 2, 2024 9:08 AM
**To:** Zucker,Jordan <JZucker@americandriveline.com>
**Subject:** Re: Read: Rent

Jordan,

I have called and emailed Paul Kuske several times over the last few weeks. I have yet to receive a response. Is he still with Aamco? It is my understanding that the Brentwood Aamco has been relocated and the property at 8503 Manchester Road is now empty. Who should I contact to arrange a visit to the property next week? Thanks for your help.

Tim Montileone

EXHIBIT

B

President

Montileone Industries, Inc.

Cell 417-849-3702

Fax 417-887-1261

On Feb 1, 2024, at 8:15 PM, Zucker,Jordan <JZucker@americandriveline.com> wrote:

Hi Tim.  Saw your message yesterday.

First, is my understanding no rent was payable to you yesterday, Jan 31.

I have to look further into this situation and will be in touch tomorrow.

**From:** tjmontileone@mchsi.com <tjmontileone@mchsi.com>
**Sent:** Thursday, February 1, 2024 4:33:37 PM
**To:** Zucker,Jordan <JZucker@americandriveline.com>
**Subject:** Re: Read: Rent

**Caution:** This is an external email that originated from outside the organization. Please take caution when clicking links or opening attachments.

Please respond.

**From:** "Zucker,Jordan" <JZucker@americandriveline.com>
**To:** "tjmontileone" <tjmontileone@mchsi.com>
**Sent:** Wednesday, January 31, 2024 11:30:57 PM
**Subject:** Read: Rent

Your message

  To: Zucker,Jordan
  Subject: Rent
  Sent: Wednesday, January 31, 2024 6:30:31 PM (UTC-05:00) Eastern Time (US & Canada)

 was read on Thursday, February 1, 2024 12:30:39 AM (UTC-05:00) Eastern Time (US & Canada).

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful. This email has been scanned for viruses and malware and may have been automatically archived.

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful. This email has been scanned for viruses and malware and may have been automatically archived.

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful. This email has been scanned for viruses and malware and may have been automatically archived.



### HEIN SCHNEIDER & BOND P.C.

<div align="right">

JOHN HEIN
(jjh@hsbattorneys.com)

</div>

March 4, 2024

Mr. Jordan Zucker
Vice President – Law
American Driveline Systems / AAMCO Transmissions
410 Horsham Road, Suite 105, Horsham, PA 19044

> **Re:    *8503 Manchester Road, Brentwood, MO 63144***

Dear Mr. Zucker:

This Firm represents Tim Montileone and Montileone Properties, LLC regarding certain of their real estate and business matters, including the property located 8503 Manchester Road, Brentwood, MO 63144 (the "***Property***").

As you know, the Property is the subject of an October 2018 Lease Agreement (the "***Lease***") by and between AAMCO Transmissions, LLC ("***AAMCO***") and Montileone Properties, LLC (the "***Company***"). It has come to our attention that AAMCO has vacated the Property. That of course does not relieve AAMCO of its obligations under the Lease— including maintenance, the payment of rent, payment of real estate taxes and the obligation to maintain insurance on the Property, all of which the Company expects AAMCO to perform.

As you also know, Section 15.1 of the Lease obligates AAMCO to provide the Company and its agents and representatives with full access to the Property within seventy-two (72) hours of receiving written request, which AAMCO has failed and refused to do despite email correspondence by and between Tim Montileone and AAMCO requesting such access. To the extent that AAMCO does not intend to comply with the terms of the Lease and the obligations set out above, please contact me immediately so the Company can take the appropriate action.

Hein Schneider & Bond P.C.

*John Hein*

John Hein



EXHIBIT
C

---

**24SL-CC02642**



April 15, 2024


Mr. Tim Mantileone
Montileone Properties, LLC
4268 S Hillcrest Ave
Suite 112
Springfield, Missouri 65810


RE:    8503 Manchester Rd Finish Restoration

Mr. Montileone,

We are pleased to provide a proposal for the restoration of the interior finishes at the facility at 8503 Manchester Road.  Musick Construction Company proposes the proposed work can be completed for the cost of Fifty-eight thousand three hundred sixty-seven dollars and 00/100, ($58,367.00) for this project. This pricing is based upon on-site discussions, the attached sketch, and the attached scope of work and clarifications.

The above pricing is based upon the attached scope of work developed by phone on 4/12/2024. In addition, we propose to complete the rest of the finish restoration work as voluntary alternates for the following amounts. Please see the attached scope of work for detailed descriptions of what these amounts include.
- Alternate #1: Restore remainder of finishes – Add $20,021.
- Alternate #2: Electrical work in new walls only – Add $10,161.

All above pricing is based upon approval to proceed with the associated scope at different times. If all three are approved at the same time, we will maintain our previous proposal revision's lump sum price of Eighty-three thousand two hundred fifty-eight dollars ($83,258).

Thank you for the opportunity to work with you.  Feel free to contact me with any questions.


Respectfully,

*Brian Wilhelm*

Brian Wilhelm
Assistant Project Estimator
Don C. Musick Construction Company


**EXHIBIT**

**D**



Project Scope of Work
- Demolish portion of existing wall for new hollow metal door and frame.
- Construction of new interior metal stud & drywall partitions as indicated in the attached sketch at Offices 1 & 2 only.
- Finish drywall to level 4 and prime/paint areas of new construction to match adjacent walls.
    o If repainting of the other walls within the office space is desired, please add $2,911 to the above cost of work. This pricing is based upon one coat of paint on drywall partitions only. No painting work is included in the Warehouse area.
- Furnish and install the following door components at the associated locations:
    o Office 2 – 3068 Hollow metal door and frame with office leversets
- Grinding of existing epoxy flooring and preparation for new carpet tile or sealed concrete.
- Furnish and install new carpet tile and vinyl base in Offices 1 & 2 only.
- Patch missing section of acoustical ceiling grid and tile to match existing.
- Furnish and install new acoustical ceiling tiles only to replace existing stained tiles. Additional tiles may be replaced on a time and material basis, if desired.
- Grinding, preparation, and sealing of exposed concrete in the Warehouse, Restroom, and corridor, as shown in the blue highlighted areas in the attached sketch.

Alternate #1 Scope of Work
- Construction of new interior metal stud & drywall partitions as indicated in the attached sketch at all other locations.
- Finish drywall to level 4 and prime/paint areas of new construction to match adjacent walls.
- Furnish and install the following door components at the associated locations:
    o Conference Room – 3068 Hollow metal door and frame with passage leverset. Please note that this door will not be able to lock.
    o Mechanical Room – 3068 Hollow metal door & frame with storeroom lockset, kickplate, and closer.
    o Warehouse– 3068 hollow metal door & frame with office leverset, panic bar, closer, and kickplate.
    o Corridor – Replacement 3068 hollow metal door slab only with office leverset, panic bar, closer, and kickplate
    o Restroom – Replacement 3068 hollow metal door slab only with closer, kickplate, and privacy lockset.
- Furnish and install new carpet tile and vinyl base in all other locations as indicated in attached sketch.

Alternate #3 Scope of Work
- Restore electrical and low voltage to conditions shown in the attached sketch, including new receptacles and phone/data ports approximately where shown in this drawing. We have assumed that the receptacles shown in existing walls are functional and to remain.



## Project Specific Clarifications

- No permits, permit fees, or inspections are included in this proposal. Our understanding is that this work is considered maintenance and repair, and therefore does not require a permit. Additional costs may apply if a permit is required.
- All doors will be painted to match building standard.
- No glass, vision lites, or sidelites are included in this proposal.
- We assume that the existing HVAC, plumbing, fire protection, and electrical services are adequate for the proposed scope of work.
- We assume that the existing fire protection layout will provide adequate coverage for the restored layout. No fire protection work is included in this proposal.
- We have assumed the existing concrete floors can be cleaned or ground to a suitable condition for new flooring or concrete sealing and that excessive grinding or concrete replacement is required.
- We have included a $15 per square yard material cost for the carpet tile in this proposal. Final pricing may change based on material selection. We will provide a sample book of materials in this price range at no charge for selection.

## Standard Clarifications and Qualifications

1. This proposal is valid for (15) calendar days.
2. Work shall be performed between the hours of 7:00 a.m. and 3:30 p.m. Premiums for overtime and shift work are not included.
3. Hazardous waste remediation and / or removal is not included in our proposal.
4. Architectural and engineering fees are not included in our proposal.
5. Premiums that may be required to meet MBE/WBE/DBE participation are not included.
6. Performance and payment bonds are not included in our proposal.
7. Builder's risk insurance is not included in our proposal.
8. Musick Construction will assist the Owner with coordination of the testing agency. Cost for materials testing services is not included in our proposal.
9. Musick Construction is not a design entity. In the event of a conflict between this document, governmental codes and requirements, and the request for proposal, this document shall govern.
10. We have assumed that existing building systems are in working order, have adequate capacity, and are at the correct elevation to serve the space.
11. Repair of existing code violations, as well as repairs and upgrades for existing systems is not included.
12. We have not included cost for moisture remediation measures (if required).
13. Material Availability: If any labor, material or equipment becomes either wholly unavailable, or unavailable at commercially-reasonable prices, at the time required by Contractor for its Work, such unavailability shall be deemed an event of Force Majeure, entitling Contractor to an extension of its performance schedule, to the extent such unavailability causes a delay to the critical path of Contractor's Work.
14. Prompt Payment: If any supplier of materials or equipment requires a down payment to place an order, Contractor will invoice Owner for the required down payment; the contractor will thereafter place an order for materials or equipment promptly upon its receipt of such deposit.





**24SL-CC02642**



# Berkshire Hathaway Homestate Insurance Company

a member of the Berkshire Hathaway group of insurance companies

## Quote

| | | | |
|---|---|---|---|
| Insured Name: | MONTILEONE PROPERTIES LLC | Quote Date: | 4/15/2024 |
| Effective Date: | 4/15/2024  12:01AM | Quote ID: | 1757049 |
| Expiration Date: | 4/15/2025  12:01AM | Primary Risk State: | Missouri |
| Agency: | Barker-Phillips-Jackson, Inc. | | |
| Producer: | | Underwriter: | Robert Henry |
| Producer Phone: | (417)887-3550 | Phone: | (800) 488-2930 |
| Commission: | 22.5% | Email: | RHenry@bhhomestate.com |

### Property Coverage

| Coverage | Limit/TIV | Coins | Valuation | Cause of Loss | Ded | Premium |
|---|---|---|---|---|---|---|
| Building | $600,000 | 80% | Replacement Cost | Special Incl Theft | $5,000 | $7,116 |

*See Schedule

### Assessments

| | |
|---|---|
| | |

### Endorsements

| Total Commercial Property Premium | $7,116 |
|---|---|

### Policy Totals

| | |
|---|---|
| **Total Premium Without Terrorism Coverage*** | **$7,116** |
| Optional Terrorism Coverage for Certified Acts* | $142 |
| **Total Policy Premium With Terrorism Coverage*** | **$7,258** |

*May include balance to meet minimum premium

Quote is valid through: 4/15/2024  12:01:00AM

**This is NOT a binder of insurance.  Company must be notified prior to binding coverage.**

EXHIBIT

E

**Quote ID** 1757049

**First Named Insured** MONTILEONE PROPERTIES LLC

**DBA**

**BH HC Berkshire Hathaway** HOMESTATE COMPANIES

**Additional Interests**

**Policy Additional Named Insured(s)**
None

**Property**
None

**General Liability**
None

**GL Additional Interest Forms**
None



Insured Name: MONTILEONE PROPERTIES LLC                    Quote ID: 1757049

| Terms and Conditions |
| --- |

This quote is being offered subject to the following terms and conditions. The Company disclaims any responsibility for your failure to reconcile the original application with coverage quoted herein. Failure to comply with the following conditions may result in cancellation.

- Excluded Coverage for Tenant Damage
- Excluded Coverage for Cosmetic Loss to Metal Roof Coverings Caused by Hail
- A Per Building Deductible will apply in accordance with how buildings are shown on the Schedule in the policy.
- Insured Required to Maintain Public Utilities
- Insured Required to Perform Physical Inspections of the Property
- Vandalism:
  1-1 Excluded
- Copper Theft:
  1-1 Policy Term Aggregate Limit of Insurance: $25,000, Per-Building Deductible: $5,000
- Multiple Deductibles:
  1-1 Windstorm or Hail Deductible: $12,000
- 3 Years (or purchase/possession date if within 3 years) of loss runs dating up to and including our inception date. If purchased or possessed within 3 years, or if this is a NEW PURCHASE effective our inception date, please make a note of this in your reply. If loss runs are not available, we will accept a signed and dated loss/no loss statement from the Insured covering the equivalent time period.
- Current color photos of at least TWO sides of the Building(s) listed on the Insured's property schedule. Web photos and faxes are not acceptable
- The Policyholder Disclosure Notice of Terrorism Insurance Coverage signed and dated by the Insured if the Insured elects to purchase TRIA coverage. This form is included with your quote or can be obtained on-line at www.bhhc.com in the Property Rater under the Documents tab of the Insured's file. This form only needs to be signed if the insured elects to purchase TRIA coverage.
- No Unreported Losses
- Based on our Insurance to Value tool, one or more buildings limits is outside a reasonable range of values
- All requested documents are due within 20 days of binding.
- DUE AT BINDING: A no-loss letter signed & dated by the insured, covering the period that the property has been without coverage, up to & including our inception date. This is due in addition to other loss history requirements that may be stated above.
- Appurtenant structures, including but not limited to fences, detached garages, and sheds, must be specifically scheduled to receive coverage.
- QUOTE SUBJECT TO NO MAJOR RENOVATIONS INCLUDING ADDITIONS, DEMO, OR ADJUSTING LOAD-BEARING WALLS.
- QUOTE SUBJECT TO UTILITIES BEING MAINTAINED FOR THE DURATION OF THE POLICY TERM.
- QUOTE SUBJECT TO PREMISES 100% VACANT.  WE SHOULD BE NOTIFIED PROMPTLY OF ANY CHANGE IN OCCUPANCY FOR COVERED PREMISES.
- QUOTE SUBJECT TO NO LOSSES OR UNREPAIRED DAMAGES.

**This is NOT a binder of insurance.  Company must be notified prior to binding coverage.**

| Disclosure Statement |
|---|

The premium for this account includes a commission that is within the terms of your normal commission schedule included within the provisions of your Agency Agreement.  If your agency contract includes a Profit Sharing Agreement, this policy may or may not be included in that profit sharing plan.  It's unclear at this time whether you will be eligible for profit sharing or whether this individual account will increase or decrease any profit sharing payout as the loss ratio is undetermined at this time and any payments are not guaranteed.



Insured Name:   MONTILEONE PROPERTIES LLC                    Quote ID: 1757049

## PROPERTY COVERAGE SUMMARY

**Location Number:** 1 - 8503 MANCHESTER RD SAINT LOUIS MO 63144

| Building Number: | Rating Type: | Construction Type: | RCP Code: | Group II | Year Built: | Square Feet: | Vacant Date: |
|---|---|---|---|---|---|---|---|
| 1 | Class Rated | Non-Combustible | 2302 | 1B | 1984 | 3,200 | 3/1/2024 |

| Occupancy Description | Coverage Description | Exposure | Cause of Loss | Valuation | Coins % | Ded | Term Premium | Annual Net Rate |
|---|---|---|---|---|---|---|---|---|
| REMODELING - VACANT COMMERCIAL - [0-10]% INCREASE | Building | $600,000 | Special Incl Theft | Replacement Cost | 80% | $5,000 | $7,116 | 1.186 |
| Exposure Total: | | $600,000 | | | | | $7,116 | |
| **Total Location Values:** | | **$600,000** | | | | | **$7,116** | **1.186** |

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| **Total Policy Values:** | **$600,000** | | | **$7,116** | **$7,116** | **1.186** |

\* Coverage is subject to a Blanket Limit of Insurance and Coinsurance.
† See Schedule

Coverage forms and endorsements are available for viewing in the forms library under your agency login at bhhc.com.

Insured Name: MONTILEONE PROPERTIES LLC                                    Quote ID: 1757049

| Schedule of Common Forms and Endorsements | | |
|---|---|---|

| Form Number | Edition Date | Form Name |
|---|---|---|
| ILM0314 | 09/2021 | BERKSHIRE HATHAWAY HOMESTATE COMPANIES |
| CD24 | 07/2003 | COMMON POLICY DECLARATIONS |
| ILS 0001 | 05/2013 | COMMON POLICY FORMS SCHEDULE |
| ILB 0017 | 06/2015 | COMMON POLICY CONDITIONS |
| ILB 5821 | 08/2015 | EXCLUSION FOR WAR, NUCLEAR RISK (INCLUDING RADIOACTIVE), AND BIOLOGICAL RISK (INCLUDING CHEMICAL) |
| M 5748 | 10/2013 | SANCTION EXCLUSION |
| M 5872 | 09/2020 | CHANGES TO COMMON POLICY CONDITIONS - CANCELLATION |
| M 5932 | 03/2020 | MISSOURI POLICYHOLDER NOTICE |

Coverage forms and endorsements are available for viewing in the forms library under your agency login at bhhc.com.

Insured Name: MONTILEONE PROPERTIES LLC                                    Quote ID: 1757049

| Schedule of Property Forms and Endorsements | | |
|---|---|---|

| Form Number | Edition Date | Form Name |
|---|---|---|
| CPD 0001 | 04/2013 | COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS |
| CPS 0001 | 05/2013 | COMMERCIAL PROPERTY COVERAGE PART FORMS SCHEDULE |
| CPM2039 MO | 11/2009 | VACANT BUILDING PROPERTY COVERAGE FORM |
| CP 1030 | 06/2007 | CAUSES OF LOSS - SPECIAL FORM |
| CP 0128 | 07/2000 | MISSOURI - CALCULATION OF ADDITIONAL PREMIUM |
| CPB 9010 | 09/2019 | MORTGAGEHOLDER CANCELLATION NOTICE |
| IL 0101 | 04/2022 | MISSOURI CHANGES |
| IL 0105 | 10/2008 | MISSOURI CHANGES - POLLUTION |
| IL 0274 | 02/2013 | MISSOURI CHANGES - CANCELLATION AND NONRENEWAL |
| IL 0935 | 07/2002 | EXCLUSION OF CERTAIN COMPUTER-RELATED LOSSES |
| IL 0952 | 01/2015 | CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM |
| IL 0995 | 01/2007 | CONDITIONAL EXCLUSION OF TERRORISM |
| CPM2042 | 01/2009 | NEWLY ACQUIRED OR CONSTRUCTED PROPERTY |
| CP 0090 | 07/1988 | COMMERCIAL PROPERTY CONDITIONS |
| CP 0140 | 07/2006 | EXCLUSION OF LOSS DUE TO VIRUS OR BACTERIA |
| CPM 1110 | 07/2022 | MULTIPLE CAUSES OF LOSS DEDUCTIBLE FORM |
| CPM 2050 | 10/2017 | COPPER THEFT LIMITATION |
| CPM 9903 | 07/2015 | EXCLUSION - MAJOR RENOVATIONS |
| CP 1032 | 08/2008 | WATER EXCLUSION ENDORSEMENT |
| CP 1055 | 06/2007 | VANDALISM EXCLUSION |
| CP 1075 | 12/2020 | CYBER INCIDENT EXCLUSION |
| CPB 1006 | 05/2014 | AMENDED UTILITIES AND INSPECTION REQUIREMENTS |
| CPB 1240 | 07/2022 | WINDSTORM OR HAIL ONE YEAR NOTICE OF LOSS AMENDATORY ENDORSEMENT |
| CPB 1244 | 07/2023 | ACTUAL CASH VALUE ENDORSEMENT |
| CPB 2001 | 05/2023 | EXCLUSION - NAMED CONSTRUCTION MATERIALS |
| CPB 4032 | 04/2023 | EXCLUSION - PFAS (PERFLUOROALKYL AND POLYFLUOROALKYL SUBSTANCES) |



Insured Name: MONTILEONE PROPERTIES LLC                                      Quote ID: 1757049

| Question Summary | | |
|---|---|---|
| Question Class | Question | Answer |
| Property - General | Is this risk currently or has it previously been insured by any of the Berkshire Hathaway Homestate Companies, National Fire & Marine Insurance Company, or National Indemnity Company of Mid-America? | No |
| Property - General | Is any building heated by a wood stove? | No |
| Property - General | Is there any renovation or construction work being done or planned during the policy period? | No |
| Property - General | Does any building have unrepaired property damage? | No |
| Property - General | Is every building a new purchase within the last three days, or not yet purchased? | No |
| Property - General | What date did most recent coverage expire? (if no prior coverage, please input the purchase date) | 2024-04-05 |
| Property - General | Has the named insured filed for bankruptcy in the last 5 years or are they currently in legal reorganization? | No |
| Property - General | Has the applicant, or any other business ventures the applicant is involved in, had any arson-related losses at any property within the last 5 years? | No |
| Property - General | Has any scheduled location experienced a Property or General Liability loss greater than $25,000 or more than two losses in the past three years? (Loss Runs required after binding) | No |
| Property - General | Has any location experienced a copper theft or water damage loss in the past three years? | No |
| Property - General | Does the building contain both Habitational and Retail exposures? | No |
| Property - General | Does any risk have "property in the open" exposure? | No |
| Property - General | Is any scheduled building a residential condo, townhome unit, or a commercial unit within a shared building (i.e. a strip mall or office complex)? | No |
| Property - General | Is any property a greenhouse, tent, yurt, air supported dome, or similar structure constructed with glass or canvas? | No |
| Property - Generic Vacant | Is it the intent of the owner to rent or sell the property? | Yes |
| Property - Generic Vacant | Is the reason for vacancy due to eviction? | No |
| Property - Generic Vacant | Is the building(s) secured and checked at least once a month? | Yes |
| Property - Generic Vacant | Are all utilities operational and to remain operational during the vacancy? | Yes |
| | | |

Quote ID: 1757049

# POLICYHOLDER NOTICE OF
# TERRORISM INSURANCE COVERAGE

Berkshire Hathaway Homestate Insurance Company            ("Insurer") hereby notifies you that under the Terrorism Risk Insurance Act of 2002, including all amendments thereto, (the "Act"), you have a right to purchase insurance coverage for losses arising out of certified acts of terrorism as defined in the Act. The term "certified act of terrorism" means any act that is certified by the United States Secretary of the Treasury, in consultation with the United States Secretary of Homeland Security and United States Attorney General, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

YOU SHOULD KNOW THAT IF YOU ELECT TO PURCHASE COVERAGE FOR LOSSES ARISING OUT OF CERTIFIED ACTS OF TERRORISM, THERE IS AN ANNUAL LIABILITY CAP FOR COVERED TERRORISM LOSSES UNDER THE ACT EQUAL TO $100,000,000,000 OF AGGREGATE INSURED LOSSES AS DEFINED IN THE ACT. LOSSES PAID UNDER THIS COVERAGE WILL BE PARTIALLY REIMBURSED BY THE UNITED STATES UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. UNDER THIS FORMULA, THE UNITED STATES PAYS A PORTION(85% IN CALENDAR YEAR 2015, DECREASING BY 1% EACH YEAR STARTING JANUARY 1, 2016, UNTIL REACHING 80% ON JANUARY 1, 2020) OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY-ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. ANY INSURER THAT HAS SATISFIED THEIR STATUTORILY-ESTABLISHED DEDUCTIBLE IS NOT LIABLE FOR, AND THE UNITED STATES SECRETARY OF THE TREASURY IS NOT AUTHORIZED TO PAY, ANY PORTION OF SUCH LOSSES EXCEEDING THE CAP ON ANNUAL LIABILITY OF$100,000,000,000. THE ADDITIONAL PREMIUM CHARGED FOR THIS COVERAGE IS STATED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

**SELECTION OR REJECTION OF TERRORISM INSURANCE COVERAGE**

UNDER FEDERAL LAW IF THE POLICY YOU HAVE APPLIED FOR IS APPROVED, YOU HAVE THE RIGHT TO ACCEPT OR REJECT COVERAGE FOR A CERTIFIED ACT OF TERRORISM SUBJECT TO THE POLICY'S OTHER TERMS, CONDITIONS, EXCLUSIONS, AND LIMITS. THERE IS ADDITIONAL PREMIUM FOR THIS COVERAGE AS SHOWN BELOW.

| ☐ | hereby elect to purchase coverage for a certified act of terrorism for an additional annual premium of $    142    . I understand that if my application for coverage is approved, my policy will be issued without the Insurer's standard terrorism exclusion, but such coverage would be subject to all of the other Policy terms, conditions, exclusions, and limits (including an exclusion for acts of terrorism not certified by the Secretary of Treasury). Terrorism involving Nuclear, Biological or Chemical Terrorism is excluded. **If the Terrorism Risk Insurance Act of 2002, including all amendments thereto, is not extended beyond December 31, 2020, then terrorism coverage under this policy may be affected.** |
|---|---|

**NOTE: If you do not elect to purchase coverage and pay the additional premium within two weeks of receiving this notice, you will not have terrorism coverage under this policy.** Your policy will be issued with no coverage for losses arising from any act of terrorism, and the Insurer's standard Terrorism Exclusion will be part of your policy.

_____        _____
Applicant's Signature                                                          Date

_____        _____
Print Name of Applicant                                                    Policy Number

_____
Print Corporate Title if Policy Applicant is a Corporation

**M-5827 (01/2015)**



# Binding Procedures - Commercial Property

You may bind coverage for an account for which you have received a formal quote, provided there are no additions, alterations or omissions to any of the terms of the coverage requested, by following the instructions below. Our premium indications are valid for 30 days or the quote effective date, whichever comes first.

**New Direct Bill Option:** Direct Bill account coverage will be bound no earlier than 12:01 AM the day after the bind is initiated online.

---

**TO BIND COVERAGE:** You will receive a link from noreply@bhhomestate.com. Follow the link in the email to our online binding mechanism. You will then have four options:

**1. PREMIUM FINANCED POLICIES:** Not an option for non-admitted business. Premium Financed Policies will be run through our Direct Bill mechanism, but will be on a full payment plan. You may choose to pay now and pay the policy premium in full at time of bind, or pay within five days. The insured will be billed and shall be responsible for any additional premium that is endorsed onto the policy. If the insured elects to premium finance the endorsed premium it is the insured's responsibility to contact the premium finance company.

**2. MORTGAGEE BILL:** Not an option for non-admitted business. This is only available if there is the same single mortgagee on every property on the policy. Upon selection of this option, the mortgagee will be billed directly.

**3. DIRECT BILL:** Not an option for non-admitted business.

   **A. PAY NOW:** Down payment must be processed through our online system at the time of bind. If valid payment is not received at the time of bind, no coverage will be in effect. Please gather payment information (bank routing #, checking account # or credit/debit card #, expiration date and security code) from the insured before starting the bind process.

   **B. PAY WITHIN FIVE DAYS:** Your agency will be directly responsible for all earned premium on the policy. If the down payment is not received by us within five (5) calendar days, a notice of cancellation will be issued for nonpayment of premium.  For renewals only, insured will be responsible for earned premium.

**4. AGENCY BILL:** This is the only option for all non-admitted business (annual pay) and may be an option for a few selected agencies.

---

# Questions about binding?
# Contact P&C Client Services at (877) 680-2442

Commissions will be paid monthly as payments are received. Commission statements and checks are generated at the beginning of each month.

---



**Berkshire Hathaway**
**H O M E S T A T E  C O M P A N I E S**

PO Box 31145 • Omaha, NE 68131
bhhc.com

**Direct Bill**
**Payment Plan Options**

Date: 04/15/2024

Billing Services:
1-877-680-2442
7:00 AM-7:00 PM Central Time, Mon-Fri
billing@bhhomestate.com

Applicant Name: **MONTILEONE PROPERTIES LLC**

Quote Number: 1757049

<u>Indicated Premium:</u>  **$7,258.00**    (includes government fees and assessments, if applicable)

| Payment Plans: | 11-Pay | 6-Pay | 4-Pay | 2-Pay | Full Pay |
|---|---|---|---|---|---|
| **Down Payment *** | | | | | |
| Due at Binding | $1,452.00 | $1,452.00 | $1,815.00 | $3,629.00 | $7,258.00 |
| **Installments **** | | | | | |
| Month 1 | $580.64 | $1,161.28 | | | |
| Month 2 | $580.64 | | $1,814.50 | | |
| Month 3 | $580.64 | $1,161.28 | | | |
| Month 4 | $580.64 | | | | |
| Month 5 | $580.64 | $1,161.28 | $1,814.50 | $3,629.00 | |
| Month 6 | $580.64 | | | | |
| Month 7 | $580.64 | $1,161.28 | | | |
| Month 8 | $580.64 | | $1,814.50 | | |
| Month 9 | $580.64 | $1,161.28 | | | |
| Month 10 | $580.64 | | | | |

* Down payment is rounded up to the nearest dollar. Payment of this amount may slightly lower the first installment amount due.
** Indicates number of months after policy effective date.

Direct Bill policies require a down payment at the time of binding. The down payment may be submitted online from the insured's bank account, credit or debit card during binding. Subsequent installments will be due on the same calendar day as the effective date of the policy. Please see the payment plan options above.

## Recurring Payments



Recurring payments are a convenient and secure option to automatically deduct insurance payments from a bank account, credit card, or debit card on the scheduled due date. Enroll by completing the Recurring Payment Authorization form or by calling Billing Services at 1-877-680-2442  7 am - 7 pm Central Time Monday - Friday.

M-8711 (12/2017)



**Berkshire Hathaway**
HOMESTATE COMPANIES

Recurring Payments
Authorization Form

PO Box 31145 • Omaha, NE 68131
bhhc.com

Insured Name: **MONTILEONE PROPERTIES LLC**

Policy/Quote Number:    1757049

Agency Name: **Barker-Phillips-Jackson, Inc.**

| Billing Services: |
|---|
| 1-877-680-2442 |
| 7:00 AM-7:00 PM Central Time, Mon-Fri |
| billing@bhhomestate.com |

Recurring payments are a convenient and secure option to automatically deduct your insurance payment from your bank account, credit card or debit card on the scheduled due date. When enrolled in recurring payments the installment fee is eliminated, lowering your bill.

**Select a Request Type:**    Enroll in Recurring Payments ☐    Change Recurring Payments Account ☐    Stop Recurring Payments ☐
*(only signature and date required)*

Name on Account: _____    Account Holder Address: _____

City/State/ZIP: _____    E-mail Address for Receipts: _____

**Enroll using a Checking/Savings Account**    Account Type:    Checking Account ☐    Savings Account ☐

Bank Name: _____

Routing Number*: _____    Account Number: _____
*Please note that a routing number has exactly nine digits.*

**Enroll using a Credit/Debit Card***    Card Type:    Visa ☐    Master Card ☐    Discover ☐    American Express ☐

Card Number: _____    Expiration Date: _____
*A nominal transaction and reversal may appear on your statement due to our validation process.*

### Please submit this completed form via one of the following methods:
- **FAX** to 1-866-897-2393
- **MAIL** to PO Box 31145, Omaha, NE 68131
- ****E-MAIL WILL NOT BE ACCEPTED****

**Please Note:** Down payments will not be processed from the information on this form. Down payments may be processed online at the time of binding or by calling Billing Services.

A payment schedule will be mailed to you showing the dates and amounts of your recurring payments. If there is an outstanding bill when you enroll in recurring payments, a one-time payment will be processed on the bill's due date. If a payment date falls on a weekend or holiday, the payment will be drafted on the next business day. Please note that three (3) business days advance notice is required to change or stop recurring payments.

*** *I authorize National Indemnity Company [on behalf of Berkshire Hathaway Homestate Companies] to initiate automatic payments for premium on my insurance policy and its renewals to my bank account, credit card or debit card. This authority shall remain in effect until I revoke it in writing to the address above, by fax to 1-866-897-2393 or by calling Billing Services. I authorize my financial institution to debit the above designated bank account, credit card or debit card, and understand that I will receive advance notice of any increase in payments which result from endorsements to or renewal of my policy.***

AUTHORIZED SIGNATURE: _____    Date: _____

M-8710 (02/2018)



# STATEMENT OF NO LOSS

| AGENCY | NAMED INSURED | |
|---|---|---|
| | | |
| **CONTACT NAME:** | **CARRIER** | **NAIC CODE** |
| **PHONE (A/C, No, Ext):** | | |
| **FAX (A/C, No):** | **POLICY NUMBER** | |
| **E-MAIL ADDRESS:** | | |
| **CODE:** **SUBCODE:** | **APPROVED BY** | |
| **AGENCY CUSTOMER ID:** | | |

## I CERTIFY THAT I AM NOT AWARE OF ANY LOSSES, ACCIDENTS OR CIRCUMSTANCES THAT MIGHT GIVE RISE TO A CLAIM UNDER THE INSURANCE POLICY WHOSE NUMBER IS SHOWN ABOVE, FROM 12:01 AM ON _____ TO _____

CANCELLATION DATE                DATE AND TIME SIGNED

_____

APPLICANT'S SIGNATURE

## RECEIPT

$ _____ AMOUNT RECEIVED BY: _____

PRODUCER

_____    _____

WITNESS                DATE AND TIME

ACORD 37 (2008/01)

© 1996-2008 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD